[No. 52580–3. En Banc. January 22, 1987.]

CERTIFICATION FROM THE
UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WASHINGTON
IN
KATHLEEN M. GEORGE, *Plaintiff*, v. PARKE–DAVIS,
ET AL, *Defendants*.

*Feltman, Gebhardt, Eymann & Jones, P.S.,* by *John S. Glassman* and *Richard C. Eymann,* and *Evans, Craven & Lackie, P.S.,* by *Constance D. Gould,* for plaintiff.

*Witherspoon, Kelley, Davenport & Toole,* by *William D. Symmes* and *Brian T. Rekofke,* for defendant Parke–Davis.

*Huppin, Ewing & Anderson, P.S.,* by *Irving Paul,* for defendants Stanlabs Pharmaceutical Co., et al.

*Lee, Smart, Cook, Martin & Patterson, P.S., Inc.,* by *John W. Schedler,* for defendant Lemmon Co.

*Lane, Powell, Moss & Miller,* by *Robert L. Israel* and *Janet D. Reis,* for defendant McKesson and Robbins, Inc.

*Randall & Danskin, P.S.,* by *Robert P. Hailey,* for defendant Rorer, Inc.

*Helsell, Fetterman, Martin, Todd & Hokanson,* by *Karen J. Vanderlaan,* and *Crosby, Heafey, Roach & May,* by *Peter W. Davis* and *Joseph P. Mascovich,* for defendant Eli Lilly.

*Mullin, Etter & Cronin, P.S.,* by *Ronald K. Mullin* and *Steven M. Cronin* (*Kevin J. Dunne,* of counsel), for defendant Upjohn.

*Williams, Kastner & Gibbs,* by *Douglas A. Hofmann, John A. Knox,* and *Jan C. Kirkwood,* for defendant E. R. Squibb & Sons.

DORE, J.—The Federal District Court in Spokane certified seven questions to this court regarding a tort claim filed by Kathleen George against the defendant DES manufacturers and distributors. These questions focus on how

liability should be apportioned among the defendants, and ask for explanation and clarification of this court's decision in *Martin v. Abbott Labs.*, 102 Wn.2d 581, 689 P.2d 368 (1984).

In *Martin,* we developed the theory of market share alternate liability. Under this theory, a plaintiff can state a cause of action for injuries associated with her mother's ingestion of DES by suing one or more DES manufacturers and alleging the following: (1) her mother took DES, (2) the DES caused her subsequent injuries, (3) the defendant or defendants produced or marketed the type of DES taken by her mother, and (4) this production or marketing of DES constituted the breach of a recognized legal duty to the plaintiff. *Martin,* at 604. Individual defendants can exculpate themselves if they can establish that for whatever reason they did not market the DES which could have caused the plaintiff's injuries. If the defendants cannot exculpate themselves from liability then they are presumed to have equal market shares unless they can establish their actual market share in the relevant geographic market. *Martin,* at 605–06. If any defendant can establish its actual market share, then this figure, rather than the presumptive share, controls.

George contends she was injured because of DES ingested by her mother. The federal court has certified seven questions to discuss liability apportionment among defendants in light of *Martin.*

### QUESTION ONE

Under the successor liability rules of *Martin v. Abbott Labs.*, 102 Wn.2d 581, 689 P.2d 368 (1984), in determining whether a transferee is holding itself out to the general public as a continuation of the transferor by producing the same product line under a similar name, is successor liability limited to circumstances where the transferor and transferee both manufacture the specific product DES in its various forms and dosages, or is it sufficient for the purposes of finding successor liability if the successor corpora-

tion carries on the general pharmaceutical business of its predecessor, although it does not continue to produce the specific product DES?

In *Martin v. Abbott Labs., supra,* we ruled on the question of whether a successor corporation could be liable for injuries caused by its predecessor's defective product. Under traditional corporate successor rules, a corporation purchasing the assets of another corporation does not by virtue of that purchase become liable for the debts of the selling corporation. *Martin,* at 609; *Meisel v. M & N Modern Hydraulic Press Co.,* 97 Wn.2d 403, 405, 645 P.2d 689 (1982). Four narrow exceptions exist to this traditional rule, though these were developed principally to protect creditors and minority shareholders rather than tort victims.

This traditional rule denied recovery to many product liability plaintiffs, as they could not meet the narrow exceptions allowing recovery. This court, in response to this perceived inequity, developed the "product–line" exception to the traditional rule of nonliability of the successor corporation. This exception was designed to balance "the competing considerations of products liability and corporate acquisitions." *Martin,* at 616.

The product line exception requires three factors to be established in order to find liability. First, the transferee must acquire substantially all of the transferor's assets, leaving no more than a corporate shell remaining. Secondly, the transferee must hold itself out to the public as a continuation of the transferor, and must do so by producing the same product line under a similar name. Finally, the transferee corporation must benefit from the goodwill of the transferor. *Hall v. Armstrong Cork, Inc.,* 103 Wn.2d 258, 692 P.2d 787 (1984); *Martin,* at 614.

The Federal District Court has asked us to decide whether a successor corporation must continue to manufacture DES in its various forms and dosages, or merely continue to manufacture various types of pharmaceutical products in order to meet the product–line exception. Specifically, this case potentially deals with Haack, a company

which may have manufactured the DES in question. Haack discontinued operations in 1963, and was purchased by Lemmon Pharmacal (Lemmon 1). Lemmon 1 discontinued the production of DES upon acquisition or within 1 year. In 1972, Lemmon 1 adopted a plan of liquidation, and substantially all of the working assets of Lemmon 1 (renamed L.P.C. Liquidation) were purchased by Hollin. Hollin never manufactured any DES, and Lemmon 1 had not manufactured it within the last 7 years, if it ever had at all. After Hollin acquired L.P.C. Liquidation, it changed its name to Lemmon Pharmacal (Lemmon 2). The plaintiff has asserted that Lemmon 2 is liable for the injuries caused by Haack's DES production.

This court, relying on the decision in *Ray v. Alad Corp.*, 19 Cal. 3d 22, 560 P.2d 3, 136 Cal. Rptr. 574 (1977), required the production of essentially the same product line in order to establish liability, because the transferee corporation has "the knowledge necessary for gauging the risks of injury from previously manufactured [units] together with the opportunity to provide for meeting the cost arising from those risks by spreading it among current purchasers of the product line . . ." *Martin v. Abbott Labs.*, 102 Wn.2d 581, 614, 689 P.2d 368 (1984), quoting *Ray*. Following this rationale, Lemmon 1 would be liable to George for Haack's production of DES if Lemmon 1 continued production of DES after acquisition of Haack. The *Martin* decision would be on point as liability is extended to a successor corporation which continued to manufacture its predecessor's line of DES.

However, to impose liability to a successor corporation which does not manufacture DES is too broad an extension of our decision in *Martin*. The underlying rationale for the product–line exception in products liability has three justifications. First, the plaintiff would have no other recovery than that against the successor corporation. Secondly, the successor corporation has a greater ability to spread the risk among future consumers of the same product. Thirdly, the successor corporation benefits from the assumption of

the old corporation's goodwill and therefore should shoulder the burdens associated with those products. *Meisel,* at 407; *Ray,* at 25.

The first reason is true in almost all circumstances, and while it may be a justification for spreading the risk from consumers to corporations in certain situations, we do not premise liability on manufacturers solely because of their ability to pay tort judgments. The second and third reasons, however, are not met in this type of case. There is a difference between manufacturing the same type of product and remaining in the same sort of manufacturing business. A purchaser of DES may be asked to pay a small additional price to cover the past and present injuries caused by that particular drug, but it is neither logical nor fair to ask consumers of wholly unrelated pharmaceuticals also to pay a premium for injuries caused by DES. The product line exception requires the corporation to manufacture the same type of product, and not merely stay in the same type of manufacturing business.

Furthermore, while a successor corporation may receive goodwill from the purchase of all facets of the old corporation, liability is only premised on that part of the goodwill associated with the injurious product. The fact that a company manufactures additional products should have no effect on this goodwill, and recovery on the basis of other products should be denied. Thus, in this example, Lemmon 2 is not liable for injuries caused by Haack's DES under the product–line exception.

## QUESTION TWO

In a products liability action, in order to hold the successor of a DES manufacturer liable must the plaintiff rely entirely on the "product line" rule of successor liability announced in *Martin,* or may the plaintiff also prove any one of the four traditional exceptions to nonliability in the sale–of–assets context, *i.e.,* (1) purchasing company expressly or impliedly agreed to assume liability; (2) the purchase was a de facto merger or consolidation; (3) the

purchaser is a mere continuation of the seller; (4) the transfer of assets was accomplished to fraudulently avoid liabilities?

Lemmon argues that plaintiffs in products liability suits must rely entirely upon the "product–line" rule of successor liability formulated in *Martin*. Lemmon maintains that the four traditional exceptions to the nonliability of the successor corporation were developed to protect creditors and minority shareholders. *Martin*, at 609. Therefore, since a products liability plaintiff is not a creditor or minority shareholder, that plaintiff should not be able to avail herself of the traditional exceptions which allow recovery from successor corporations.

■ This argument is clearly incorrect. The *Martin* successor liability rules were adopted to supplement the four traditional rules allowing for recovery because those rules inadequately deal with products liability plaintiffs. Some courts have simply expanded these traditional rules to take account of the peculiar requirements of these plaintiffs. *See, e.g., Knapp v. North Am. Rockwell Corp.*, 506 F.2d 361 (3d Cir. 1974); *Turner v. Bituminous Cas. Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976). No case has precluded a plaintiff from seeking to impose liability on the basis of one of the exceptions. As we stated in *Hall*, "the policies underlying strict liability in tort necessitated the formation of an additional exception or rule to address the particular circumstances of a products liability claimant." *Hall*, at 262. The four exceptions still apply.

## QUESTION THREE

In defining the geographic market for the purposes of establishing actual market shares of the defendants, should a nationwide market be used, and market share be calculated on the basis of nationwide data regarding product distribution, or should the market share of the defendants be determined based upon sales only in the local market, *e.g.*, the particular pharmacy or pharmacies or city in which plaintiff's mother allegedly bought her DES (depending on

the specificity of her proof), with actual market share cal-culated on the basis of evidence of distribution to that par-ticular local market? Does the result change if data is unavailable to establish the extent of defendants' partici-pation in a local market?

▉ In *Martin,* we held that drug companies producing DES would not be liable if

> they did not produce or market the particular type DES taken by the plaintiff's mother; that they did not market the DES in the geographic market area of plaintiff moth-er's obtaining the drug; or that they did not distribute DES in the [proper] time period . . .

*Martin,* at 605. This statement requires that the relevant market for determining liability be as narrow as possible. Thus, in this case, in which the plaintiff's mother allegedly purchased the DES in one pharmacy in Idaho, that partic-ular pharmacy should be the relevant market. This defini-tion is in keeping with the overall purpose of "market–share alternate liability": the imposition of liability only on those companies who potentially could have manufactured the drug which caused the injuries.

We recognize, however, that our adoption of a very small market for determining liability makes the determination of defendants' actual market shares in some cases very dif-ficult if not impossible. We are dealing with events which occurred decades ago, and the relevant records may have been lost, the pharmacies may have gone out of business, and the witnesses may have forgotten which brand of DES was used. This, of course, will not always be the case. If there does exist evidence which with sufficient probability yields accurate market share figures in the plaintiff's par-ticular geographic market, these figures should be used to the exclusion of any other data. If these figures do not exist, however, then other figures, such as distribution figures within the county, state, or even in the country may in cer-tain circumstances be introduced.

We are cognizant that even the national set of figures for DES may not reliably reflect the true distribution of that

drug to the relevant geographic market. We are not in a position to decide in this case, or in any case because of the varying geographic markets and local data available, whether the national figures are sufficiently accurate to justify their use. This is not a novel situation. Judges are often required to determine if the evidence presented is sufficiently representative and material to meet the relevancy thresholds of Rules of Evidence 401 and 402. This determination of whether the evidence is relevant will be left to the trial court's discretion as it is in the best position to decide in each case whether the national or regional figures are a good approximation for the relevant geographic market. *Ladley v. St. Paul Fire & Marine Ins. Co.*, 73 Wn.2d 928, 442 P.2d 983 (1968).

National figures should therefore be admitted when the trial court determines that they tend to establish an accurate approximation of the drug companies' local market shares. We note, however, that the finder of fact may discount the value of these figures, especially if a combination of local, regional and national data is available. The fact finder must decide what the defendants' market shares are and if the drug companies' admissible evidence does not satisfactorily establish what their market shares are, then the pro rata presumptions described in *Martin* will apply. *See Martin,* at 605–06.

## QUESTION FOUR

Should the market shares of the respective defendants be calculated by comparing the number of DES pills of the pertinent dosage and type sold during the period of ingestion in the relevant market, or by comparing the total milligrams of DES sold during that time in that market, or revenue from the sale of said DES, or some other standard of measurement?

The purpose of the market share alternate liability is to hold liable only those drug companies which potentially could have manufactured the DES taken by the plaintiff's mother, and only in the proportion in which it

manufactured the DES that could have caused the injury. In a case such as this one, in which the defendant only took 25 milligram tablets, the best measure of market share would therefore be based on a comparison of the number of pills of that dosage and type sold by the drug manufacturers during the relevant time period. Any other basis of measurement would tend to distort the amount of DES manufactured by the drug companies which actually could have caused the plaintiff's injuries.

Nevertheless, not all cases will have such simple facts. A plaintiff's mother could have taken a variety of dosages or a combination of different pills to arrive at the same dosage. Furthermore, some drug companies may not have accurate records for the number of pills manufactured, but do have reliable figures on the total number of milligrams produced or revenue generated from their DES production. In these cases, if the trial judge determines that those figures are sufficiently reliable to meet the evidence rule relevancy threshold for admissibility, then that information may also be used to calculate market share. Again, however, the drug companies have the burden of establishing their market shares, and if the figures they present are viewed as too speculative by either the judge in a relevancy determination or are discounted as inaccurate or unrepresentative by the fact finder at trial, then the pro rata formula in *Martin* applies. *See Martin,* at 605–06.

QUESTION FIVE

For the purposes of calculating actual and presumptive market share of a defendant DES manufacturer, should consideration be made of the shares of DES manufacturers who could not have been exculpated from the lawsuit under *Martin,* but have been dismissed on the basis of successor nonliability, or are defunct, or otherwise unavailable as defendants for reasons of bankruptcy, receivership and/or insolvency, or otherwise?

The plaintiff in this case urges us to reconsider the part of our holding in *Martin,* in which liability is held to be

several, rather than joint and several. Thus, in a case in which the only two defendants can establish that they each had 30 percent of market share, the plaintiff would recover 60 percent from those two defendants and have the remaining 40 percent uncompensated. This, the plaintiff argues is unfair, and would be avoided if the court would adopt joint and several liability.

This result was specifically considered and rejected by *Martin,* at 600–02. The result, which may have been countenanced by the California Supreme Court in *Sindell v. Abbott Labs.,* 26 Cal. 3d 588, 607 P.2d 924, 163 Cal. Rptr. 132, *cert. denied,* 449 U.S. 912 (1980) was rejected because it distorts liability in favor of the plaintiff. We believe that our prior reasoning was correct and see no reason to modify that part of the decision in *Martin.*

█ Furthermore, we believe that the fact that a corporation is bankrupt, defunct or otherwise unamenable to suit should have no impact in determining actual market shares. Under traditional rules of tort recovery, the mere lack of amenability to suit did not relieve a company from liability. The plaintiff who could not recover from a tortfeasor could not obtain compensation from another tortfeasor unless liability was joint and several. Thus, applying these rules to this case, an insolvent drug company which distributed DES to the relevant market should be calculated in the market share analysis. That the plaintiff will not receive damages because the judgment will be unsatisfied is a problem facing all plaintiffs.

The previous analysis covers those cases in which all defendant drug manufacturers establish their actual market share. The cornerstone of market share alternate liability is that if a defendant can establish its actual market share, it will not be liable under any circumstances for more than that percentage of the plaintiff's total injuries. If a defendant establishes that its actual market share was 5 percent, and the plaintiff's injuries were $100,000, then the defendant would always be liable for $5,000, irrespective of other defendants' actual or presumptive shares.

However, if the defendants cannot establish their actual market share, then the presumptive pro rata liability formula announced in *Martin* is used. A problem unfortunately develops when we consider the effect defunct corporations would have when liability is calculated by presumptive shares. If defendant drug corporations could file third party complaints against defunct corporations, then the viable drug corporations would reduce their pro rata share as more defendants would be proportionally responsible for the plaintiff's damage award. The additional shares would not be recovered by the plaintiff, as the new defendants would be judgment proof. Thus, presumptive liability under the *Martin* approach would be a vehicle by which the defendants could reduce their own liability while at the same time requiring the plaintiff to absorb the presumptive liability of these newly added defunct corporations. This is neither fair nor equitable.

We therefore order the application of the following method to reduce the likelihood that this sort of abuse will occur. If the defendants implead a third party defendant who for whatever reason is not amenable to suit, then the impleading defendants have the burden of establishing the actual market share of the impleaded defendant. If this actual damage can be calculated, then it should be included in the market share calculations. Because we have rejected joint and several liability, the other viable drug companies do not have to pay for its damages. The plaintiff simply will not recover those damages. However, a defendant should not be able to use the presumptions of liability as a sword to reduce its liability by impleading third party defendants who are not amenable to suit, and whose market shares cannot be calculated. Otherwise, a potential for abuse is possible, and the viable defendants would be more interested in joining insolvent corporations to lower their share of presumptive liability than establishing their actual market shares.

The preceding rules can best be illustrated by an example. Assume a plaintiff, who has suffered $100,000 worth of

damages, sues two viable drug companies, A and B. A can establish its actual market share was 20 percent, while B cannot establish its actual market share and must rely on the pro rata presumptions established in *Martin.* In order to reduce its liability, B impleads third party drug manufacturers C, D and E. C is a viable company which cannot establish its actual market share and which must rely on the pro rata presumption of *Martin.* D is not amenable to suit, but it is established that its actual market share is 10 percent. E is not amenable to suit and its actual market share *cannot* be calculated. The following chart represents the liabilities of the various parties:

| Drug Company | Percent Liable | Total Liability | Plaintiff's Recovery |
|---|---|---|---|
| A | 20 | $20,000 | $20,000 |
| B | 35 | 35,000 | 35,000 |
| C | 35 | 35,000 | 35,000 |
| D | 10 | 10,000 | 0 |
| E | 0 | (not a proper defendant) | |
| TOTAL PLAINTIFF RECOVERY | | | $90,000 |

A is liable for 20 percent on the basis of its actual market share. D is liable for 10 percent on the basis of its actual market share, but because it is judgment proof, the plaintiff cannot collect the $10,000. B and C are presumptively liable for the remaining $70,000, and must split this liability pro rata so that they are each liable for $35,000. E is not a proper defendant, both because it is unamenable to suit and because its actual market share cannot be calculated. The plaintiff will recover only $90,000 of her damages, because she cannot recover the $10,000 judgment against drug company D.

QUESTION SIX

Under *Martin* and the Washington tort reform act, RCW 4.22, is a bulk supplier of raw diethylstilbestrol liable in a product liability action for indemnification and/or contribution to a tableter of DES, *i.e.,* a pharmaceutical company

which processes the raw DES by adding various binders and other inert ingredients, makes tablets of various dosages, and packages the DES with its own directions and warnings, assuming that said tableter is found liable to a plaintiff for injuries sustained *in utero* by a fetus whose mother ingested the DES sold to the tableter by the bulk supplier? Does the result differ if the bulk supplier also distributed its own DES at retail, with its own directions and warnings?

The factual background to this question is as follows. Stanley Drug Company has asserted that Eli Lilly Drug Company supplied it with the DES it used to make 25 mg tablets. Eli Lilly apparently also made 25 mg tablets, but sold them for a greater wholesale price than the plaintiff's mother had paid for the pills. Thus, Eli Lilly had exculpated itself from liability. The plaintiff has requested this court to allow her to sue Eli Lilly as manufacturer and Stanley has submitted a claim against Eli Lilly for contribution and indemnity. Stanley and the plaintiff, in essence, ask this court to create *vertical* liability between the manufacturer of DES and the distributor, in addition to the horizontal liability which *Martin* established among the various distributors of DES.

In Washington, products liability claims are governed by statute. RCW 7.72.010(2) defines a manufacturer as a party who "designs, produces, makes, fabricates, constructs, or remanufactures *the relevant product or component part of a product . . .*" (Italics ours.) Stanley argues that, following the rationale of *Martin,* each defendant who "contributed to the risk of injury" bears some culpability to the plaintiff. A bulk supplier of DES, who manufactured the drug knowing it would be used for pregnant women's disorders, did contribute to the risk of injury and should be jointly and severally responsible for the plaintiff's injuries pursuant to RCW 4.22. Furthermore, since Eli Lilly also manufactured and sold DES tablets, then at least in this case it had an affirmative duty to prevent such distribution, both at the retail and wholesale level. Breach of this duty also creates

joint and several liability between the manufacturer and distributor and pursuant to RCW 4.22.050, a right of contribution would exist between them.

Eli Lilly counters, however, with the assertion that the decision in *Martin* as well as other jurisdictions mandates the opposite result. Eli Lilly was dismissed in *Martin* after it showed it did not manufacture the "type of DES" taken in that case. *Martin,* at 590. DES is an unpatented chemical, easy to manufacture, and therefore, Lilly infers that this court meant the type of tablet when it referred to the type of DES.

■ We agree with Lilly that there should be no vertical liability in DES cases. DES is not inherently harmful, and still is prescribed today for ailments not associated with pregnant women. Thus, it is the way in which DES is used, and not DES per se, which is harmful. Furthermore, the United States Federal Drug Administration requires the tablet manufacturers, and not the bulk manufacturers, to account for and warn of a drug's properties. 21 U.S.C. § 355. It would therefore be anomalous to require the raw manufacturer to conduct separate tests to determine the adverse effects of the drug when by federal statute, the tablet manufacturer bears this responsibility. Finally, allowing an action for contribution would put a potentially abusive weapon into the plaintiff's hands. A plaintiff could sue defunct corporations who received the drug from solvent bulk suppliers on the grounds that recovery could be obtained from this source.

## QUESTION SEVEN

Under *Martin* and the Washington tort reform act, RCW 4.22, if plaintiff settles with a defendant DES manufacturer, to what extent and in what manner, if any, will a remaining defendant be able to reduce its presumptive and actual market share with reference to the settling defendant? What, if any, effect does the trial court's determination that the settlement was reasonable in amount have on nonsettling defendants' reduction of presumptive or actual

market share?

The plaintiff and the drug companies propose different ways in which a settlement should be factored into market share liability calculations. These are best demonstrated by the following example. Assuming there were three defendants, and plaintiff's injuries were $100,000. The plaintiff settled with one defendant for $20,000 and the other two could not establish their proportionate liabilities and those were therefore governed by presumption. (If the drug companies can establish their actual market shares, then their shares of liability would be this percent of market shares multiplied by the plaintiff's proven damages irrespective of the settlement.)

The drug companies propose that the fact that a settlement occurred be ignored except that the settling defendant would only pay the amount of the settlement regardless of the outcome of the case. Thus, if the settling defendant's market share could not be established, (by either the plaintiff or any defendant) then all three defendants would be responsible for one–third the plaintiff's injuries, or $33,333. The settling defendant, by virtue of the settlement, would only pay $20,000, and the difference between the settlement and the "deserved" recovery, $13,333 ($33,333–20,000), would be uncompensated.

The plaintiff proposes an alternate procedure in which the settling defendant is simply removed from the picture as if it had never existed. Thus, there would be only two defendants, and $80,000 worth of damages ($100,000—20,000 received as a settlement). This would be split evenly between the two remaining defendants, $40,000 each, as the presumption of equal liability would control. Thus, the plaintiff would receive the full $100,000: $20,000 from the settling defendant and $40,000 from each of the remaining two defendants.

■ The drug companies argue the plaintiff's option leaves room for flagrant abuse. If the plaintiff settles for nominal amounts with all but one defendant, the last defendant would be required to pay the lion's share of the

damages. Furthermore, RCW 4.22.050, which gives the defendant the right of contribution, would not apply because the statute requires joint and several liability, and that is not present here. While we believe a settlement hearing procedure like that set down in RCW 4.22.060 should be used to determine if the settlement is reasonable, we believe the plaintiff's proposed option has the inherent problem that neither the plaintiff nor the settling defendant has any incentive to make a reasonable settlement.

No such difficulty exists with the drug companies' option. Although the plaintiff is concerned that an unreasonable market share may be assigned to the settling defendant, this does not seem likely. Market share will be determined by fact or presumption as usual, and it makes sense that a settlement should not alter this historically established figure. There is no reason why the plaintiff should be able to profit from a settlement that is too low, and no reason why both the plaintiff and the drug companies should not be able to determine approximately what figure represents a reasonable settlement in light of the liability rules established by *Martin*.

SUMMARY

We answer the seven certified questions as follows:

1. Successor liability is limited to those cases in which the transferor and transferee both manufacture DES.

2. The four traditional rules of successor liability still apply.

3. National figures may be admitted if local data is not available and if the trial judge determines that they are sufficiently accurate to establish a reasonable approximation of the drug companies' market shares.

4. In this case, the number of pills sold by the defendants should be used.

5. Defunct corporations should be figured into market share calculations if their actual market shares can be calculated. Viable defendants, however, cannot implead defunct corporations to reduce their liability by use of

the pro rata presumptions set forth in *Martin*.

6. There is no vertical liability between raw drug manufacturers and tablet manufacturers.

7. Settlements between the plaintiff and drug manufacturers should be ignored when calculating both actual and presumptive liability.

PEARSON, C.J., and UTTER, BRACHTENBACH, DOLLIVER, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.