570 So.2d 275 (1990)
Terri Lynn CONLEY, Petitioner, Cross-Respondent,
v.
BOYLE DRUG COMPANY, Etc., et al., Respondents, Cross-Petitioners.
No. 67626.
Supreme Court of Florida.
November 1, 1990.
Rehearing Denied January 9, 1991.
*278 Dianne J. Weaver of Weaver, Weaver, Lardin & Petrie, P.A., and Nancy Little Hoffmann of Nancy Little Hoffmann, P.A., Fort Lauderdale, for petitioner/cross-respondent.
James E. Tribble and Diane H. Tutt of Blackwell, Walker, Fascell & Hoehl, Miami, for Boyle Drug Co., Ortho Pharmaceutical Corp. and E.R. Squibb & Sons, Inc. and Sandoz, Inc.
Ted R. Manry, III of MacFarlane, Ferguson, Allison & Kelly, Tampa, for The Upjohn Co.
Hugh J. Turner, Jr. of Kelley, Drye & Warren, Miami, Russel H. Beatie, Jr. of The Law Offices of Russel H. Beatie, Jr., New York City, and Arthur J. England, Jr. of Fine, Jacobson, Schwartz, Nash, Block & England, Miami, for Eli Lilly and Co.
Lamar D. Oxford of Dean, Ringers, Morgan & Lawton, Orlando, for Abbott Laboratories.
Richard A. Kupfer of Wagner, Nugent, Johnson, Roth, Romano, Eriksen & Kupfer, P.A., West Palm Beach, amici curiae, for The Ass'n of Trial Lawyers of America and The Academy of Florida Trial Lawyers.
Jack W. Shaw, Jr. of Mathews, Osborne, McNatt & Cobb, P.A., Jacksonville, amicus curiae, for Florida Defense Lawyers Ass'n.
EHRLICH, Justice.
We have for review Conley v. Boyle Drug Co., 477 So.2d 600 (Fla. 4th DCA 1985), in which the district court certified the following question as being of great public importance:
DOES FLORIDA RECOGNIZE A CAUSE OF ACTION AGAINST A DEFENDANT FOR MARKETING DEFECTIVE DES WHEN THE PLAINTIFF ADMITTEDLY CANNOT ESTABLISH THAT A PARTICULAR DEFENDANT WAS RESPONSIBLE FOR THE INJURY?
*279 Id. at 607-08. We have jurisdiction, article V, section 3(b)(4), Florida Constitution, and answer the question as restated below in the affirmative:
DOES FLORIDA RECOGNIZE A CAUSE OF ACTION AGAINST A DEFENDANT FOR NEGLIGENTLY MANUFACTURING AND MARKETING DES OF THE TYPE WHICH CAUSED A PLAINTIFF'S INJURY WHEN THE PLAINTIFF AFTER A REASONABLE EFFORT IS UNABLE TO ESTABLISH THAT A PARTICULAR DEFENDANT WAS RESPONSIBLE FOR THE INJURY?
In 1977, Terri Lynn Conley, a Florida resident, was diagnosed as suffering from cervical adenosis, a precancerous growth, and underwent surgery for the removal of most of her cervix, and other precancerous and cancerous tumors. Ms. Conley filed suit against eleven defendants who manufactured and marketed the drug diethylstilbestrol (DES) between 1941, the year the FDA authorized the marketing of DES,[1] and the present. The action was based upon theories of negligence, strict liability, breach of warranty and fraud.
Ms. Conley alleged that while she was in utero, during a period between June 1955 and March 1956, her mother was administered DES while in Broward County, Florida, and that her cancer was linked to her mother's ingestion of the drug. She also alleged that the named defendants were the manufacturers of a substantial share of the drug which caused her injury and that the named defendants knew or should have known of the danger the cancer-causing agent contained in the drug presented to unborn children, but failed to warn of this danger. Ms. Conley further alleged that, through no fault of her own, she was unable to identify the manufacturer of the DES ingested by her mother.
In an attempt to state a cause of action despite her inability to identify the specific manufacturer, Ms. Conley urged four theories of liability which relax the traditional requirement of tort law that a plaintiff must identify a specific tortfeasor as causing her injury. The four theories are alternative liability, concert of action, enterprise liability, and the market share theory of liability. The trial court granted various motions to dismiss and motions for judgment on the pleadings because of Ms. Conley's inability to identify the specific manufacturer of the drug. On appeal, the district court affirmed the trial court's rulings, stating that "[w]hile this court sympathizes with Ms. Conley, we must conclude that we have no authority to approve a theory of liability which does not require her to pinpoint the specific defendant that caused her injury." Id. at 602.
The common problem facing plaintiffs alleging injury by in utero exposure to DES is the inability to identify the precise manufacturer or distributor of the DES taken by the plaintiff's mother decades before the injury manifests itself. The generic nature of the DES marketed for use in preventing miscarriages, the number of producers or distributors of the drug,[2] the lack of pertinent records and the passage of time are factors which contribute to the identification problem. See Collins v. Eli Lilly Co., 116 Wis.2d 166, 176-81, 342 N.W.2d 37, 42-45, cert. denied, 469 U.S. 826, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984). Until recently, a clear majority of courts have dismissed an action when the plaintiff was unable to identify the manufacturer of the DES which caused her injury.[3] Since *280 1980, a growing number of courts have permitted such an action to continue either by applying accepted theories of liability or by formulating new theories.[4]
In Celotex Corp. v. Copeland, 471 So.2d 533 (Fla. 1985), this Court was asked to adopt the best known of these theories, the Sindell[5] market share theory of liability, in an asbestos case. However, we declined to do so, finding that "market share theory [was] an inappropriate vehicle with which to apportion liability for the asbestos-related injury in [that] cause." 471 So.2d at 537. Our holding was based primarily upon the fact that Copeland was able to identify several of the manufacturers of the products to which he was exposed.[6] Recognizing that "[t]he market share theory of liability was developed to provide a remedy where there is an inherent inability to identify the manufacturer of the product that caused the injury," we concluded that Celotex was an inappropriate case in which to determine whether such a theory of liability should be adopted in Florida. Id. Both the district court and the petitioner urge that this is an appropriate case for the adoption of a modified theory of market share liability.
In certifying the question before us, the district court has given us the benefit of its observations on the subject.[7] The district court considered and rejected each of the theories of liability which were proposed by Ms. Conley, concluding that none of them was properly tailored for application in this case. 477 So.2d at 602-05. Recognizing that "traditional theories of tort law are inadequate to redress the appellant's injuries," id. at 602, the district court suggests that the identification requirement be relaxed in a situation such as that before us. The district court urges this Court to adopt, with some alterations, the "market-share alternate liability" theory adopted by the Washington Supreme Court in Martin v. Abbott Laboratories, 102 Wash.2d 581, 602, 689 P.2d 368, 381 (1984). 477 So.2d at 605-06.
Ms. Conley agrees with the district court that the market-share alternate theory of liability is best suited to Florida's "developing products liability law" and urges its adoption, as modified by the district court. However, as she did before the district court, Ms. Conley also offers the theories of alternative liability, concert of action, enterprise liability, and the Sindell market share theory of liability for our consideration. We agree with the district court's analysis and rejection of each of these theories. 477 So.2d at 602-05. We therefore focus our discussion on the district court's proposed theory of liability.
*281 After discussing the various theories of liability employed by other jurisdictions, the district court concluded that the market-share alternate liability theory adopted by the Washington Supreme Court in Martin should be adopted in Florida. The Martin court, as did the district court below, rejected the four theories of liability commonly raised in DES cases, opting for a modified version of the market share theory of liability first announced by the California Supreme Court in Sindell.
Sindell also involved an action brought against manufacturers of DES in which the plaintiff was unable to identify the manufacturer of the precise DES ingested by her mother. The market share theory of liability as formulated in Sindell is a modification of the alternative liability theory (also referred to by the Martin court as alternate liability theory) first introduced by the California Supreme Court in Summers v. Tice, 33 Cal.2d 80, 199 P.2d 1 (1948), and later set forth in section 433B(3) of the Restatement (Second) of Torts (1965). Sindell, 26 Cal.3d at 611, 607 P.2d at 936, 163 Cal. Rptr. at 144.
The theory of alternative liability applies where the conduct of two or more actors is tortious, and it is proved that the injury to the plaintiff was caused by only one of them, but there is uncertainty as to which one actually caused it. Under these circumstances, the burden is placed upon each of the negligent actors to prove that he did not cause the plaintiff's injury. Defendants unable to meet the burden are held jointly and severally liable. Restatement (Second) of Torts § 433B(3). This theory of liability is based on a policy determination that an innocent plaintiff should not be without a remedy because he is unable to prove which of the negligent defendants caused his injuries. Summers, 33 Cal.2d at 86-88, 199 P.2d at 4-5.
Although the Sindell court found the Summers rule inapplicable in a DES case in which all possible manufacturers of the drug in question are not joined, it used that theory of liability as a foundation for formulating its market share theory. Under the Sindell approach, the plaintiff need only show that her condition was caused by the drug DES and that those companies joined as defendants produced a substantial share of the DES that her mother could have taken. If a substantial share of the market is joined, each defendant will be held liable for the proportion of the judgment represented by its share of that market unless it can show that it did not produce the drug which caused the injury. Sindell, 26 Cal.3d at 612, 607 P.2d at 937, 163 Cal. Rptr. at 145.
The Martin court rejected the Sindell market share theory reasoning that "[n]ot only does the Sindell court fail to define `substantial' share of the relevant market, the theory distorts market liability by providing that the `substantial' market share bears joint responsibility for 100 percent of plaintiff's injuries."[8] 102 Wash.2d at 602, 689 P.2d at 381. The Martin court opted instead for what it described as a modification of the alternative liability theory "along the lines of the Sindell market-share approach." 102 Wash.2d at 603, 689 P.2d at 381. The court found support for such an approach in comment h of the Restatement (Second) of Torts § 433B(3) (1965), which provides:
The cases thus far decided in which the rule stated in Subsection (3) has been applied all have been cases in which all of the actors involved have been joined as defendants. All of these cases have involved conduct simultaneous in time, or substantially so, and all of them have involved conduct of substantially the same character, creating substantially the same risk of harm, on the part of each actor. It is possible that cases may arise in which some modification of the rule stated may be necessary because of *282 complications arising from the fact that one of the actors involved is not or cannot be joined as a defendant, or because of the effect of lapse of time, or because of substantial differences in the character of the conduct of the actors or the risks which they have created. Since such cases have not arisen, and the situations which might arise are difficult to forecast, no attempt is made to deal with such problems in this Section. The rule stated in Subsection (3) is not intended to preclude possible modification if such situations call for it.
The Washington court reasoned that all the manufacturers and distributors who produced or marketed the allegedly defective drug for the prevention of miscarriages contributed to the risk of injury to the public and, consequently, to the risk of injury to individual plaintiffs. Thus, even though a given defendant may not have contributed to the actual injury of an individual plaintiff, "each defendant shares in some measure a degree of culpability in producing or marketing DES." 102 Wash.2d at 604, 689 P.2d at 382. The court went on to conclude that as between an innocent plaintiff and a possibly responsible drug company, the drug company, who can either insure itself against liability, absorb the damage award, or pass the cost along to the consuming public, should bear the burden of the cost of the injury. Id.
Under the Martin approach, the plaintiff need join only one defendant and allege:
that the plaintiff's mother took DES; that DES caused the plaintiff's subsequent injuries; that the defendant produced or marketed the type of DES taken by the plaintiff's mother; and that the defendant's conduct in producing or marketing the DES constituted a breach of a legally recognized duty to the plaintiff.
Id. The plaintiff need not allege or prove that a particular defendant produced or marketed the precise DES taken by her mother. At trial, the plaintiff need only establish by a preponderance of evidence that a defendant produced or marketed the type of DES, as distinguished by identifiable characteristics such as dosage, color, shape, size or markings, taken by her mother. She need not allege or prove the time of or the geographic area of distribution of the DES. 102 Wash.2d at 604-605, 689 P.2d at 382.
Under this theory a defendant may exculpate itself from liability by establishing, by a preponderance of evidence, that it did not produce or market the type of DES taken by the plaintiff's mother; that it did not market DES in the geographic market area where the mother obtained the drug; or that it did not distribute DES during the time period of the ingestion. 102 Wash.2d at 605, 689 P.2d at 382. Those defendants that are unable to exculpate themselves are deemed members of the relevant market which is defined by the specificity of the evidence as to geographic market area, time of ingestion, and type of DES. The designated members are initially presumed to have equal shares of the market and are liable only for the percentage of the plaintiff's judgment that represents their presumptive share of the market. A defendant can reduce its presumptive share and, thus, reduce its potential liability by establishing its actual share of the relevant market. Once a defendant establishes its respective market share it is liable only for that share of the total judgment. The presumed market share of other defendants who fail to establish their actual market share is then adjusted so that 100 percent of the market is accounted for. Defendants may reduce their presumptive market share by impleading third party defendants.[9] If all defendants carry their burden, *283 thus establishing their actual share of the market, "no defendant will be held liable for more harm than it statistically could have caused in the respective market." 102 Wash.2d at 606, 689 P.2d at 383.[10]
We agree with the United States District Court for the District of Massachusetts, which adopted the Martin market-share alternate theory of liability, that "the magnitude of the physical and psychological injuries which are at issue in DES cases counsels toward permitting a remedy under some form of a market-share theory of liability." McCormack v. Abbott Laboratories, 617 F. Supp. 1521, 1526 (D.Mass. 1985). Adoption of such a theory of liability would not be the first time this Court has recognized the unique circumstances surrounding the injury suffered by the DES plaintiff. We have recognized that, because of the delay between the mother's ingestion of the drug and the manifestation of the injury to the plaintiff, DES cases must be accorded different treatment than other products liability actions for statute of repose purposes. See Pullum v. Cincinnati, Inc., 476 So.2d 657, 659 n. * (Fla. 1985), appeal dismissed, 475 U.S. 1114, 106 S.Ct. 1626, 90 L.Ed.2d 174 (1986); Diamond v. E.R. Squibb & Sons, Inc., 397 So.2d 671 (Fla. 1981).
Likewise, recognition of such an approach to liability where the manufacturing and marketing practices involved and the delayed harmful effect on the nonconsuming plaintiff make identification impossible would not be the first time this Court has relaxed the identity requirement where it would be unjust to adhere rigidly to traditional principles of tort law. In Marrero v. Goldsmith, 486 So.2d 530 (Fla. 1986), we relaxed the exclusive control requirement in connection with the doctrine of res ipsa loquitur. In Marrero, the plaintiff, while unconscious, underwent surgery on various parts of her body. Upon regaining consciousness, she discovered an injury to a part of her body not involved in the surgical procedure. Marrero brought suit against the hospital and the three doctors involved in the surgery. Marrero's request for a jury instruction on res ipsa loquitur was denied by the trial court; this denial was affirmed by the district court. Upon review, this Court noted that although under a traditional res ipsa loquitur analysis none of the defendant doctors could be said to have had exclusive control at all times when the injury may have occurred, the patient was in no position to prove which defendant or combination of defendants caused her injury, because she was unconscious when it occurred. 486 So.2d at 533. Relying on the California Supreme Court decision in Ybarra v. Spangard, 25 Cal.2d 486, 154 P.2d 687 (1944),[11] the predecessor of Summers and Sindell, we concluded that in the unconscious patient situation the fairest course to be taken is to allow the plaintiff to go to the jury with the benefit of a res ipsa loquitur instruction, despite her inability to prove exclusive control. 486 So.2d at 533. Although the issue of identification was not directly before the Court in Marrero, the plaintiff in that case was allowed to proceed despite her apparent inability to identify which of the defendants actually caused her injury.
Respondents argue that the fashioning of a remedy for the DES plaintiff *284 which so drastically departs from traditional principles of tort law is best left to the legislature. We disagree. This Court has consistently recognized its "continuing responsibility to the citizens of this state" to modernize traditional principles of tort law when such becomes necessary "to ensure that the law remains both fair and realistic as society and technology change." Insurance Co. of North America v. Pasakarnis, 451 So.2d 447, 451 (Fla. 1984); see also Gates v. Foley, 247 So.2d 40, 43 (Fla. 1971) ("this Court has not been backward in overturning unsound precedent in the area of tort law"). We agree with the district court that the theory of liability formulated in Martin provides an excellent starting point for fashioning a fair and adequate remedy for a DES plaintiff and therefore next consider the modifications to the Martin approach suggested by the court below.
The district court first suggests that the geographic market, which the Martin court failed to specifically define, be defined as the entire state of Florida, "[b]ecause we are seeking to protect persons in Florida." 477 So.2d at 607. After considering the Washington court's refinement of the market-share alternate theory of liability in George v. Parke-Davis, 107 Wash.2d 584, 733 P.2d 507 (1987), we agree with the Washington court that the relevant market for determining liability should be as narrowly defined as the evidence in a given case allows. 107 Wash.2d at 592, 733 P.2d at 512. Thus, where it can be determined that the DES ingested by the mother was purchased from a particular pharmacy, that pharmacy should be considered the relevant market. Likewise, where the county or state of ingestion is as specific an area as can be established, that geographic area will serve as the relevant market. As explained by the Washington court, defining the relevant geographic market in this manner is consistent with the fact that under the Martin theory a defendant may exculpate itself by showing that it did not market the DES in the geographic market area where the plaintiff's mother obtained the drug.[12]Id. Narrowing the relevant market is also consistent with the overall goal of market-share alternate liability. The narrower the market, the greater the likelihood that liability will be imposed only on those drug companies who could have manufactured the DES which caused the plaintiff's injuries. Id.
The main modification to the Martin approach suggested by the district court is that a defendant who is unable to exonerate itself should be held jointly and severally liable for the plaintiff's damages, rather than simply being held liable for its percentage share of the damages. 477 So.2d at 607. Under the district court's approach, such a defendant would be entitled to contribution from other manufacturers who distributed DES in the relevant market and were also unable to prove that they did not produce or distribute the DES in question. Id. We reject the district court's suggestion of joint and several liability for two reasons.
*285 First, holding defendants which were able to establish their actual market share jointly liable for 100 percent of a plaintiff's judgment would be contrary to the very premise upon which the market-share alternate theory is based, namely that "no defendant will be held liable for more harm than it statistically could have caused in the respective market." 102 Wash.2d at 606, 689 P.2d at 383. In George v. Parke-Davis, the Washington court was asked to reconsider that portion of its decision in which liability was held to be several, rather than joint and several. 107 Wash.2d at 595, 733 P.2d at 513. The Washington court again refused to incorporate joint and several liability into its market-share alternate theory, noting that "[t]he cornerstone of market share alternate liability is that if a defendant can establish its actual market share, it will not be liable under any circumstances for more than that percentage of the plaintiff's total injuries."[13]Id.
Second, joint and several liability is only favored within this state in those limited situations set forth in sections 768.81(3), (4) and (5), Florida Statutes (1989). Under sections 768.81(3), (4) and (5) joint and several liability is abrogated except: 1) in the case of economic damages "with respect to any party whose percentage of fault equals or exceeds that of a particular claimant"; 2) in "any action brought by any person to recover actual economic damages resulting from pollution, to any action based upon an intentional tort, or to any cause of action as to which application of the doctrine of joint and several liability is specifically provided by chapter 403 [pollution control], chapter 498 [land sale practices], chapter 517 [security transactions], chapter 542 [antitrust], or chapter 895 [the RICO Act]"; and 3) as "to all actions in which the total amount of damages does not exceed $25,000." In light of this express legislative pronouncement, incorporation of this doctrine into a market share theory of liability would be contrary to the policy of this state.
The district court further suggests that before a DES plaintiff be allowed to proceed under the Martin market share theory she be required to show that "because of the manufacturing and marketing practices involved, and the delayed harmful effect on the non-consuming victim, that it is not reasonably possible to identify the manufacturer of the specific DES ingested by her mother." 477 So.2d at 607. Respondents also urge that a showing of "due diligence" be a prerequisite to the use of any market share theory of liability which this Court might adopt. A due diligence showing is not imposed under the Martin approach, and such a requirement has been expressly rejected by the McCormack court. 617 F. Supp. at 1528-29. However, we believe that such a prerequisite to recovery is justified.
Market share liability is generally looked upon as a theory of last resort, "developed to provide a remedy where there is an inherent inability to identify the manufacturer of the product that caused the injury." Celotex, 471 So.2d at 537; see Note, The Application of A Due Diligence Requirement in DES Litigation, 19 J.Law Reform 771 (1986). Although in the vast majority of cases the DES plaintiff has been unable to identify the actual manufacturer or distributor of the drug causing her injury, it is clear that such identification has been made in several cases. See, e.g., Abel v. Eli Lilly & Co., 418 Mich. 311, 343 N.W.2d 164, cert. denied, 469 U.S. 833, 105 S.Ct. 123, 83 L.Ed.2d 65 (1984) (some plaintiffs in this action were able to specifically name the manufacturer of the product causing their injury); Lyons v. Premo Pharmaceutical Labs, Inc., 170 N.J. Super. 183, 406 A.2d 185 (Ct.App.Div.) (plaintiff was able to identify both the manufacturer of the tablets taken by her mother and the manufacturer of the DES used in the tablets), cert. denied, 82 N.J. 267, 412 A.2d 774 (1979). In fact, it appears that the DES daughter in Diamond was able to *286 identify Squibb as the manufacturer of the DES ingested by her mother. Where a plaintiff can identify a specific tortfeasor as causing her injury and traditional remedies are thus available, we see no reason for resort to a remedy based on the concept of risk contribution.
Accordingly, we adopt the market-share alternate theory of liability as formulated by the Washington Supreme Court. However, as a prerequisite to its use, a plaintiff must make a showing that she has made a genuine attempt to locate and to identify the manufacturer responsible for her injury. We further restrict this vehicle of recovery to those actions sounding in negligence; it may not be used in conjunction with allegations of fraud, breach of warranty or strict liability.
A DES plaintiff who cannot meet the traditional identification requirement may avail herself of this theory of liability by commencing suit against one or more defendants and alleging: 1) that she has made a reasonable attempt to identify the manufacturer responsible for her injury; 2) that her mother ingested DES during the pregnancy which resulted in the plaintiff's birth; 3) that DES caused the plaintiff's subsequent injuries; 4) that the defendant or defendants produced or marketed the type of DES taken by the plaintiff's mother; and 5) that the defendant or defendants acted negligently in producing or marketing the DES. At trial each of these elements must be proven by a preponderance of the evidence. The plaintiff need not allege or prove that a specific defendant produced or marketed the precise DES taken by her mother. The plaintiff need only establish that a defendant produced or marketed the type of DES ingested by her mother. If the plaintiff is unable to allege and prove the type of DES which was taken, as determined by dosage, color, shape, size or markings, she need only allege and prove that the defendant produced or marketed DES for use in preventing miscarriages. Allegations as to the time or the geographic area of distribution are unnecessary. Evidence as to time and area of distribution will be more accessible to the defendants, who may present such evidence in an attempt to either establish their actual share of the market or to exonerate themselves from liability.
As in Martin, an individual defendant may exculpate itself from liability by proving by a preponderance of the evidence that it did not produce or market the type of DES taken by the plaintiff's mother, that it did not market DES in the relevant geographic market area, or that it did not distribute the drug during the time period of the ingestion. Defendants who are unable to exculpate themselves will become part of the DES market, as narrowed and defined by the specificity of the evidence as to geographic market area, time of ingestion, and type of DES. Each of the remaining defendants is presumed initially to have an equal share of the market. Each defendant may rebut this presumption by establishing by a preponderance of the evidence its actual share of the relevant market during the time period in question. Any defendant able to establish its actual share will be held liable for that portion of the total judgment equal to that share. The market share of defendants who are unable to establish their actual share of the market will be adjusted so that 100 percent of the market is accounted for. Although the presumptive market share may be reduced by impleading third-party defendants, a defendant will not be allowed to lower its presumptive share of the market simply by impleading insolvent or defunct drug companies. A defendant that impleads a third-party defendant that is not amenable to suit has the burden of establishing the actual market share of the impleaded defendant. Only if the actual market share of such an impleaded defendant can be established will its share of the market be included in the market share calculations. If all defendants are able to prove their actual market share and the total of the shares represented equals less than 100 percent of the market, the portion of the judgment equal to the outstanding share of the market will not be recovered by the plaintiff.
*287 We find no merit to the respondents' equal protection, due process, and access to courts challenges to the adoption of a market share theory of liability. Under the theory of liability we adopt today, a defendant is not precluded from presenting a defense, nor is liability imposed in an arbitrary manner. Before liability is imposed under the market-share alternate theory, the plaintiff must first prove a defendant acted tortiously. Each defendant may be exonerated by establishing that it could not have produced or marketed the drug taken by the plaintiff's mother. Only those who contributed to the risk of injury and are therefore to some degree culpable will be held liable. Further, the extent to which each defendant will be held liable will be equivalent to the percentage of harm it actually could have caused within the relevant market.
Ms. Conley has alleged facts sufficient to state a claim under the above theory of liability; therefore, we quash the decision below affirming the dismissal of this action. However, on remand, before the petitioner will be allowed to proceed with her claim, it must be determined whether she has made a diligent attempt to ascertain the identity of the manufacturer of the drug causing her injury.

CROSS-PETITION
We next consider the cross-petition of Boyle Drug Company and Ortho Pharmaceutical Corporation. Cross-petitioners argue that the trial court erred in denying their respective motions to dismiss for lack of personal jurisdiction and to quash service of process. Boyle and Ortho took the position before the trial court that the court lacked personal jurisdiction over them. In its order of June 24, 1983, the trial court expressly denied Boyle's motion to dismiss for lack of jurisdiction but was silent as to the disposition of Ortho's jurisdictional motion. Ortho filed a motion for clarification seeking to determine the court's ruling on the jurisdictional issue; the motion was denied.[14] The jurisdictional issue, which was raised in a cross-appeal, was not reached by the district court below.
As they did before the trial court, the cross-petitioners maintain that because a Florida long-arm statute may not be applied retroactively, Ms. Conley was required to utilize the long-arm statute in effect between June 1955 and March 1956, the time her mother allegedly ingested the drug. Thus, before either of them would be amenable to substitute service under section 47.16, Florida Statutes (1955), Ms. Conley must allege and prove that each had undertaken "to operate, conduct, engage in, or carry on a business or business venture, in the state, or to have an office or agency in the state" and that the claim arose out of or was connected with or incidental to the doing of business within the state. Both Boyle and Ortho contend that because Ms. Conley has failed to establish that they were doing business within the state in 1955-56, the trial court lacks personal jurisdiction over them and, therefore, their respective motions to dismiss for lack of personal jurisdiction and to quash service should have been granted.
Ms. Conley takes the position that while the cross-petitioners "correctly argue that the proper method of service is that in effect at the time of the act in question, ... the jurisdictional aspects of long-arm statutes are those in effect when the cause of action accrues." Thus, she maintains that: 1) the requirements of section 47.30, Florida *288 Statutes (1955), were met and 2) the trial court had personal jurisdiction over the cross-petitioner under section 48.193(1)(f)(2), Florida Statutes (1977), because that provision was in effect at the time her cause of action accrued, when her injury manifested itself.
This Court has consistently held that neither section 48.193 nor its predecessor section 48.182, which became effective in 1970, can be applied retroactively to allow service under its provisions as to an alleged wrongful act committed prior to the enactment of the statute. See Public Gas Co. v. Weatherhead Co., 409 So.2d 1026 (Fla. 1982); AB CTC v. Morejon, 324 So.2d 625 (Fla. 1975); Gordon v. John Deere Co., 264 So.2d 419 (Fla. 1972). We reject Ms. Conley's contention that this well-established prohibition against retroactive application of a Florida long-arm statute is only applicable in connection with the manner of service employed.
A long-arm statute not only prescribes the manner of service to be utilized in connection with a nonresident over which a court may exercise in personam jurisdiction, such a statute also sets forth the acts which will subject a nonresident to the jurisdiction of a state's courts. Compare, e.g., sections 48.193(1) and (2) (set forth acts which submit nonresident to jurisdiction of Florida courts) with section 48.193(3) (provides manner of service of process to be utilized to effect personal jurisdiction under section 48.193). It is clear that one seeking to effect service under a long-arm statute has the burden of first establishing that facts exist which would subject the defendant to the jurisdiction of the court under the provisions of that statute. See Young Spring & Wire Corp. v. Smith, 176 So.2d 903 (Fla. 1965) (plaintiff seeking to effect service under section 47.16, Florida Statutes, has burden of presenting a situation which clearly justifies application of that section). The prohibition against retroactive application applies in connection with both aspects of the long-arm statute at issue.
While we agree with the cross-petitioners that it is the requirements of section 47.16 which must be met in this case, the analysis they offer to support this conclusion is not entirely correct. It is the date of the alleged negligent manufacture and distribution of DES, rather than the date of ingestion, which must be looked to in determining both the proper method of service and whether the cross-petitioners were subject to the jurisdiction of the courts of this state. See 409 So.2d at 1027. The DES ingested by Ms. Conley's mother had to have been manufactured and distributed between 1947[15] and the last date of ingestion in 1956, well before the effective date of the statutory predecessor of section 48.193. Therefore, the jurisdictional requirements of section 47.16, which was in effect during that period, must be satisfied.
We also agree with the cross-petitioners that their motions to dismiss for lack of personal jurisdiction should have been granted. The cross-petitioners have refuted by affidavit[16] the allegations that they were doing business in the state within the meaning of section 47.16. Ms. Conley has failed to offer any affidavits or other proof to refute the cross-petitioners' challenge to her personal jurisdiction allegations *289 and, thus, has failed to establish facts necessary to support the court's exercise of personal jurisdiction over them under section 47.16. See Hickok Teaching Sys., Inc. v. Equitech Training Sys., Inc., 421 So.2d 772 (Fla. 4th DCA 1982) (if defendant challenges the jurisdictional allegations by affidavit, the plaintiff must then support those allegations by affidavit or other proof).
Accordingly, we quash the decision of the district court below affirming the trial court's order dismissing the action based on Ms. Conley's inability to identify the drug company which manufactured or distributed the drug causing her injury. We remand for a hearing to determine whether Ms. Conley is entitled to proceed under the market-share alternate theory of liability as adopted in this case and for further proceedings in accordance with this opinion. On remand, the respective motions to dismiss for lack of personal jurisdiction and to quash service of process of cross-petitioners Boyle Drug Company and Ortho Pharmaceutical Corporation shall be granted.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD and BARKETT, JJ., concur.
GRIMES and KOGAN, JJ., did not participate in this case.
NOTES
[1] In 1941, new drug applications were approved by the FDA for the marketing of DES, a synthetic form of the female hormone estrogen, for the treatment of certain maladies not directly involving pregnancy. The marketing of DES for the purpose of preventing miscarriages was approved in 1947. DES was produced and marketed for use in preventing miscarriages until 1971, when medical researchers established a possible link between exposure to DES while in utero and the development in young women of a form of cancer known as clear cell adenocarcinoma.
[2] It has been estimated that up to 300 drug companies marketed DES between 1947 and 1971. Martin v. Abbott Laboratories, 102 Wash.2d 581, 589, 689 P.2d 368, 374 (1984).
[3] See, e.g., Tidler v. Eli Lilly & Co., 851 F.2d 418 (D.C. Cir.1988); Morton v. Abbott Laboratories, 538 F. Supp. 593 (M.D.Fla. 1982); Payton v. Abbott Labs, 512 F. Supp. 1031 (D.Mass. 1981); Ryan v. Eli Lilly & Co., 514 F. Supp. 1004 (D.S.C. 1981); Mizell v. Eli Lilly & Co., 526 F. Supp. 589 (D.S.C. 1981); Gray v. United States, 445 F. Supp. 337 (S.D.Tex. 1978); Smith v. Eli Lilly & Co., 137 Ill.2d 222, 148 Ill.Dec. 22, 560 N.E.2d 324 (1990); Mulcahy v. Eli Lilly & Co., 386 N.W.2d 67 (Iowa 1986); Zafft v. Eli Lilly & Co., 676 S.W.2d 241 (Mo. 1984); Namm v. Charles E. Frosst & Co., 178 N.J. Super. 19, 427 A.2d 1121 (Ct.App.Div. 1981); Lyons v. Premo Pharmaceutical Labs Inc., 170 N.J. Super. 183, 406 A.2d 185 (Ct.App. Div.), cert. denied, 82 N.J. 267, 412 A.2d 774 (1979).
[4] See, e.g., McCormack v. Abbott Laboratories, 617 F. Supp. 1521 (D.Mass. 1985); McElhaney v. Eli Lilly & Co., 564 F. Supp. 265 (D.S.D. 1983); Sindell v. Abbott Laboratories, 26 Cal.3d 588, 607 P.2d 924, 163 Cal. Rptr. 132, cert. denied, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980); Abel v. Eli Lilly & Co., 418 Mich. 311, 343 N.W.2d 164 cert. denied, 469 U.S. 833, 105 S.Ct. 123, 83 L.Ed.2d 65 (1984); Hymowitz v. Eli Lilly & Co., 73 N.Y.2d 487, 539 N.E.2d 1069, 541 N.Y.S.2d 941, cert. denied, ___ U.S. ___, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989); Martin v. Abbott Laboratories, 102 Wash.2d 581, 689 P.2d 368 (1984); Collins v. Eli Lilly Co., 116 Wis.2d 166, 342 N.W.2d 37, cert. denied, 469 U.S. 826, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984).
[5] Sindell v. Abbott Laboratories, 26 Cal.3d 588, 607 P.2d 924, 163 Cal. Rptr. 132, cert. denied, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980).
[6] Our rejection of the market share theory in Celotex was also based on the "inherent differences between asbestos products and the drug DES." Celotex Corp. v. Copeland, 471 So.2d 533, 537 (Fla. 1985). We noted that while all DES prescribed to pregnant women created the same risk of harm because it was produced using the same formula, some asbestos products present a much greater risk of harm than others due to divergent toxicities among such products. Id. at 538-39.
[7] We commend the district court for offering this Court a thorough analysis of the issue.
[8] Although the Sindell court did not expressly address whether liability under its market share theory would be several or joint and several, the California Supreme Court recently held that imposition of joint liability on defendants in a market share action would "frustrate Sindell's goal of achieving a balance between the interests of DES plaintiffs and manufacturers of the drug." Brown v. Superior Court, 44 Cal.3d 1049, 1075, 751 P.2d 470, 487, 245 Cal. Rptr. 412, 428 (1988).
[9] To avoid possible abuse of this presumptive pro rata liability formula, the Washington court has limited the circumstances under which a defendant may reduce its presumptive liability by impleading other manufacturers as follows:

If the defendants implead a third party defendant who for whatever reason is not amenable to suit [dismissed on the basis of successor nonliability, is defunct, has declared bankruptcy, or is insolvent], then the impleading defendants have the burden of establishing the actual market share of the impleaded defendant. If this actual damage can be calculated, then it should be included in the market share calculations... . However, a defendant should not be able to use the presumptions of liability as a sword to reduce its liability by impleading third party defendants who are not amenable to suit, and whose market shares cannot be calculated. Otherwise, a potential for abuse is possible, and the viable defendants would be more interested in joining insolvent corporations to lower their share of presumptive liability than establishing their actual market shares.
George v. Parke-Davis, 107 Wash.2d 584, 596, 733 P.2d 507, 514 (1987).
[10] Thus, if, for example, defendant X establishes a market share of 10 percent of the relevant market and defendant Y establishes a 70 percent market share, the plaintiff would recover $10,000 of a $100,000 judgment from X and $70,000 from Y, with the remaining $20,000 left unrecovered.
[11] In Ybarra, reasoning that it would be manifestly unfair to require a plaintiff who was rendered unconscious for the purpose of undergoing surgical treatment to identify which of several defendants caused his injury, the California Supreme Court allowed the plaintiff to utilize the doctrine of res ipsa loquitur. 25 Cal.2d 486, 494, 154 P.2d 687, 691.
[12] The Washington court further explained:

If there does exist evidence which with sufficient probability yields accurate market share figures in the plaintiff's particular geographic market, these figures should be used to the exclusion of any other data. If these figures do not exist, however, then other figures, such as distribution figures within the county, state, or even in the country may in certain circumstances be introduced.
... [The] determination of whether the evidence is relevant will be left to the trial court's discretion as it is in the best position to decide in each case whether the national or regional figures are a good approximation for the relevant geographic market. [Citation omitted].
National figures should ... be admitted when the trial court determines that they tend to establish an accurate approximation of the drug companies' local market shares... . [T]he finder of fact may discount the value of these figures, especially if a combination of local, regional and national data is available. The fact finder must decide what the defendants' market shares are and if the drug companies' admissible evidence does not satisfactorily establish what their market shares are, then the pro rata presumptions described in Martin will apply. See Martin, [102 Wash.2d] at 605-06 [689 P.2d 368].
107 Wash.2d at 592-93, 733 P.2d at 512.
[13] California and New York have held liability to be several under their respective versions of market share liability. Brown v. Superior Court, 44 Cal.3d at 1075, 751 P.2d at 487, 245 Cal. Rptr. at 428; Hymowitz v. Eli Lilly & Co., 73 N.Y.2d at 513, 539 N.E.2d at 1078, 541 N.Y.S.2d at 950.
[14] Conley takes the position that since the order of June 24 was silent as to cross-petitioner Ortho's jurisdictional motion, no written order was rendered disposing of that motion. Thus, the district court lacked jurisdiction, under Florida Rule of Appellate Procedure 9.020(g), to consider Ortho's cross-appeal. We do not agree.

The June 24 order of dismissal lists Ortho's "motion to dismiss, quash, strike Second Amended Complaint" as being considered. The motion referenced in the order contained the jurisdictional motion at issue. Since the order contained no ruling in connection with the jurisdictional motion, Ortho requested clarification as to the disposition of its "Motion to Dismiss with respect to the alleged insufficiency of service of process, lack of jurisdiction over its person." Under these circumstances, the order of June 24, coupled with the denial of the motion for clarification, must be considered an effective denial of Ortho's jurisdictional motion.
[15] The year marketing of DES for the purpose of preventing miscarriages was approved by the FDA.
[16] Boyle filed the affidavit of its former president, William Manuel, stating that it has its principal place of business in Los Angeles, California, and that it never employed agents or employees in Florida. The affidavit further stated that Boyle has never transacted business in Florida and has not done or caused any act to be done or consequences to occur in Florida which resulted in any of the consequences alleged in this case.

Similarly, Ortho filed an affidavit of its assistant secretary, Morris Malmstrom, stating that it was and is incorporated under the laws of New Jersey, with its principal place of business in New Jersey. The affidavit further stated that Ortho is not now and never has been qualified to transact business in the State of Florida; that it has never been domiciled in the state; that it does not have nor ever has it had a telephone listing or inventory in the state; that it never has paid Florida taxes; that it sells all of its products to independent distributors and wholesalers over whom it does not exercise any control.