September 24, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2263
MONICA SANTIAGO,
Plaintiff, Appellant,

v.

SHERWIN WILLIAMS COMPANY, ET AL.,
Defendants, Appellees.

ERRATA SHEET

Please make the following correction in the opinion in
the above case released on September 10, 1993:

Page 7, footnote 4: change the footnote to read as follows:

Judge Breyer dissents. In his view, despite the
equitable arguments against certification in this
case, in light of the importance of the matter
this panel should certify the issue to the Supreme
Judicial Court.

United States Court of Appeals
For the First Circuit

No. 92-2263

MONICA SANTIAGO,

Plaintiff, Appellant,

v.

SHERWIN WILLIAMS COMPANY, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Breyer, Chief Judge,

Friedman,* Senior Circuit Judge,

and Stahl, Circuit Judge

Jonathan Shapiro, with whom Stern, Shapiro, Rosenfeld &

Weissberg, Robert J. Doyle, Kehoe, Doyle, Playter & Novick, Neil T.

Leifer, Thornton, Early & Naumes, Judith Somberg, Johnson & Somberg,

Arthur Bryant, and Trial Lawyers for Public Justice, were on brief for

appellant.
Paul Michael Pohl, with whom Charles H. Moellenberg, Jr., Jones,

Day, Reavis & Pogue, Thomas J. Griffin, Jr., Loretta Smith, Erik H.

Aldeborgh, II, Goodwin, Procter & Hoar, Dale A. Normington, were on

brief for Sherwin-Williams Company, Rory FitzPatrick, Meghan H.

Magruder, Bingham, Dana & Gould, Donald A. Bright, were on brief for

Atlantic Richfield Company, Michael Nilan, G. Marc Whitehead, Janie S.

Mayeron, Popham, Haik, Schnobrich & Kaufman, Ltd., Thomas V. Urmy,

Shapiro, Grace & Haber, were on brief for SCM Corporation, Donald E.

Scott, John M. Walker, Kirkland & Ellis, David B. Garten, and Janet D.

Smith, were on brief for NL Industries, Inc., and Mary Morrissey

Sullivan, Richard Nahigian, and Sullivan, Sullivan & Pinta, were on

brief for Lead Industries Association.
David G. Owen on brief for The Business Roundtable and Chamber of

Commerce of the United States of America, amici curiae.
Stephen S. Ostrach, Emily R. Livingston and New England Legal

Foundation on brief for Associated Industries of Massachusetts and New

England Legal Foundation, amici curiae.

September 10, 1993

*Of the Federal Circuit, sitting by designation.

STAHL, Circuit Judge. In this appeal, plaintiff-

appellant Monica Santiago challenges the district court's

entry of summary judgment against her and in favor of

defendants-appellees.1 In so doing, plaintiff advances

three arguments: (1) the legal issues in this appeal should

be certified to the Massachusetts Supreme Judicial Court

("SJC"); (2) the district court erred in rejecting

plaintiff's market share liability argument; and (3) the

court erred in rejecting plaintiff's concert of action claim.

After carefully reviewing each of plaintiff's arguments, we

affirm.

I.

BACKGROUND

Plaintiff was born on November 9, 1972. From the

time of her birth until 1978, she and her family resided at

20 Leston Street in Boston. Plaintiff alleges that, during

her period of residence, she ingested lead paint that had

been applied in layers to the walls and woodwork of her home

at various times between 1917, the year of the building's

construction, and 1970. The evidence reveals that

1Defendants are Sherwin-Williams Company, NL Industries,
Inc., Eagle-Picher Industries, Inc., Atlantic Richfield
Corporation (successor to International Smelting & Refining
Company), and SCM Corporation (successor to Glidden Company).
On January 7, 1991, defendant Eagle-Picher filed for
bankruptcy in Ohio, thus automatically staying this action
against it. See 11 U.S.C. 362.

-3-

plaintiff's blood had highly elevated levels of lead by the

time plaintiff was one year of age, that the lead reached

emergency levels by July 1976, and that, as a consequence,

plaintiff had to undergo chelation therapy2 in order to

remove the lead from her body. Although plaintiff's early

development appeared to progress normally, she has been

diagnosed with a hyperactivity-attention disorder and motor

skill difficulties which her medical experts attribute to

lead poisoning.

Plaintiff initiated this action in November 1987,

contending that defendants, or their predecessors in

interest, manufactured and marketed all, or virtually all, of

the white lead used in the lead paints sold in the United

States between 1917 and 1970. Her complaint set forth claims

of negligence, breach of warranty, and concert of action.

Jurisdiction was premised upon diversity of citizenship. See

28 U.S.C. 1332.

Plaintiff could not and cannot identify either

which, if any, of the defendants are the source of the lead

she ingested or when the alleged injury-causing paint may

have been applied to the walls and woodwork of her childhood

2Chelation therapy is a procedure whereby a person with lead
poisoning is given chemicals that bind with the lead,
enabling the body to excrete it more rapidly.

-4-

home.3 She has, however, introduced (1) evidence in the

form of expert testimony that lead paint "was at minimum a

substantial contributing factor of her lead poisoning;" (2)

evidence demonstrating that all of the defendants produced

white lead for significant portions of the period between

1917 and 1970; (3) evidence that almost all of the white lead

produced for paint between 1917 and 1970 was manufactured by

defendants; and (4) evidence that, between 1930 and 1945, all

of the defendants, as members of a trade association known as

the Lead Industries Association ("LIA"), "simultaneously

coordinat[ed] promotional campaigns to increase white lead

consumption in paint and . . . work[ed] to neutralize the

growing public concern about lead paint poisoning." On the

basis of this evidence, plaintiff sought to dispense with the

identification requirement and hold defendants liable under a

market share theory. Plaintiff further argued that

defendants were liable for her injuries because of their

concerted marketing actions as members of the LIA.

By memorandum and order dated January 13, 1992, the

district court rejected plaintiff's market share claim as a

matter of Massachusetts law. In so doing, the court ruled

3There is no direct evidence that plaintiff actually ate lead

paint. There is, moreover, record evidence suggesting that,
in addition to lead paint, plaintiff could have been exposed
to airborne lead, lead from food and water, and/or lead from
soil and dust. Indeed, there is evidence indicating that
plaintiff's neighborhood, including the soil around her home,
was heavily contaminated with lead.

-5-

that even if the SJC would recognize market share liability

under some scenario, it would not do so if presented with the

undisputed facts of this case. See generally Santiago v.

Sherwin-Williams Co., 782 F. Supp. 186 (D. Mass. 1992). By

memorandum and order dated July 2, 1992, the court further

ruled that plaintiff's concert of action claim failed as a

matter of Massachusetts law because plaintiff could not

identify which of the defendants actually had committed the

tort. See generally Santiago v. Sherwin-Williams Co., 794 F.

Supp. 29 (D. Mass. 1992). It is from these rulings that

plaintiff now appeals.

II.

DISCUSSION

A. Certification

As an initial matter, plaintiff has requested that

we certify to the SJC questions regarding the viability of

market share liability and concert of action as theories of

recovery in light of the facts of this case. We note that

plaintiff first requested certification in this court, and

explicitly stated her opposition to certification at the

district court level. Now, having lost below, plaintiff has

reversed her position. Unsurprisingly, defendants oppose

plaintiff's certification request.

For reasons that are largely self-explanatory, we

have held that "one who chooses to litigate [her] state

-6-

action in the federal forum (as plaintiff did here) must

ordinarily accept the federal court's reasonable

interpretation of extant state law rather than seeking

extensions via the certification process." Croteau v. Olin

Corp., 884 F.2d 45, 46 (1st Cir. 1989); see also 17A Charles

A. Wright, Arthur R. Miller, and Edward H. Cooper, Federal

Practice and Procedure 4248, 176 (2d ed. 1988) (courts

"should be slow to honor a request for certification from a

party who chose to invoke federal jurisdiction"). The

concerns about fundamental fairness and judicial economy that

animate this general rule make us considerably less inclined

to depart from it when the plaintiff did not request

certification before the district court. See Croteau, 884

F.2d at 46.

Here, as will be demonstrated below, the district

court's interpretation of Massachusetts law was eminently

reasonable. Furthermore, plaintiff, after initially deciding

to eschew her prerogative to file this action in state court,

actively made her opposition to certification known to the

district court. In light of these facts, and given the

further fact that it has been over five years since these

federal proceedings were initiated, it would be extremely

unfair to defendants if we were to allow plaintiff to

relitigate the issues at the heart of this lawsuit.

-7-

Accordingly, plaintiff's request for certification is

denied.4

B. Standard of Review

Having dispensed with plaintiff's certification

request, we proceed to delineate the parameters of our

examination. Summary judgment allows courts to "pierce the

boilerplate of the pleadings and assay the parties' proof in

order to determine whether trial is actually required."

Wynne v. Tufts Univ. Sch. of Medicine, 976 F.2d 791, 794 (1st

Cir. 1992), cert. denied, 113 S. Ct. 1845 (1993). It should

be granted when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is only material if it has "the potential to

affect the outcome of the suit under the applicable law."

Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st

Cir. 1993). However, our reading of the facts, as derived

from the record, is always done "`in the light most amiable

to the nonmovant. . . .'" Lawrence v. Northrop Corp., 980

F.2d 66, 68 (1st Cir. 1992) (quoting Garside v. Osco Drug,

4Judge Breyer dissents. In his view, despite the equitable
arguments against certification in this case, in light of the
importance of the matter this panel should certify the issue
to the Supreme Judicial Court.

-8-

Inc., 895 F.2d 46, 48 (1st Cir. 1990)). This includes

"indulg[ing] all reasonable inferences" in the nonmovant's

favor. Id.

Our review of a summary judgment ruling is plenary.

Garside, 895 F.2d at 48. Furthermore, we are not limited to

the reasoning employed by the district court; instead, we may

"affirm the entry of summary judgment on any independently

sufficient ground made manifest by the record." United

States v. One Parcel of Real Property, 960 F.2d 200, 204 (1st

Cir. 1992).

In addition to examining the facts, a court passing

on a summary judgment motion or reviewing a summary judgment

determination must, of course, consider the applicable law.

When a plaintiff invokes diversity jurisdiction to bring a

state law claim in federal court, this survey is somewhat

circumscribed, for it is settled that, in ordinary

circumstances, a plaintiff who "selects a federal forum in

preference to an available state forum may not expect the

federal court to steer state law into unprecedented

configurations." Martel v. Stafford, 992 F.2d 1244, 1247

(1st Cir. 1993); see also Ryan v. Royal Ins. Co., 916 F.2d

731, 744 (1st Cir. 1990) (rejecting a diversity plaintiff's

attempt to stretch New York law to new frontiers without

providing a "well-plotted roadmap showing an avenue of relief

that the state's highest court would likely follow"); Porter

-9-

v. Nutter, 913 F.2d 37, 41 (1st Cir. 1990) (plaintiff who

seeks out a federal venue in a diversity action should expect

"unadventurous" interpretations of state law). Mindful of

these strictures, we turn to plaintiff's claims.

C. Market Share Liability

Plaintiff argues that the district court erred in

granting defendants summary judgment on her claim for market

share liability. In so doing, she concedes that the SJC has

never explicitly endorsed a market share liability theory of

recovery, and further recognizes that the court rejected a

certain species of market share liability advanced by

plaintiffs in a DES class action. See Payton v. Abbott

Labs., 437 N.E.2d 171, 188-90 (Mass. 1982).5 Nonetheless,

5In Payton, an action brought by a class of women whose

mothers ingested DES while pregnant with them, the United
States District Court for the District of Massachusetts
certified to the SJC the following question:

Assuming that the evidence does not warrant a
conclusion that the defendants conspired together,
or engaged in concerted action, or established
safety standards through a trade association, may
the defendant manufacturers, who probably supplied
some of the DES ingested by the mothers of the
plaintiff class, be held liable to members of the
plaintiff class when neither the plaintiffs nor the
defendants can identify which manufacturer's DES
was ingested by which mothers?

Id. at 188. The SJC ruled that it could not answer the

question in the form stated because the question "d[id] not
explicitly assume that the plaintiffs will be able to
establish the negligence of . . . defendants." Id. However,

as is discussed more fully below, the court did set forth its
general views on market share liability. In so doing, it
rejected the theory of market share liability advanced by

-10-

plaintiff asserts that certain dicta in Payton indicate that

her claim would be approved by the SJC.6 We cannot agree.

As the SJC has noted, "[i]dentification of the

party responsible for causing injury to another is a

longstanding prerequisite to a successful negligence action."

Payton, 437 N.E.2d at 188. However, some courts, cognizant

of the modern industrial reality of fungible goods which may

harm consumers but which cannot be traced to specific

producers, have relaxed this identification requirement in

certain negligence and product liability cases. In these

cases, the courts have allowed plaintiffs who are unable to

identify the particular defendant who actually manufactured

the harm-causing product to pursue their claims so long as

they are able to prove both that the product caused the harm

and that the defendants were market suppliers at the time

plaintiff had her harmful encounter with the product. See,

plaintiffs in that case. Id. at 189.

6In concluding its explicit rejection of the form of market
share liability plaintiffs sought to impose, the Payton court

stated:

That is not to say that on an adequate record
this court would not recognize some relaxation of
the traditional identification requirement in
appropriate circumstances so as to allow recovery
against a negligent defendant of that portion of a
plaintiff's damages which is represented by the
defendant's contribution of DES to the market in
the relevant period of time.

Id. at 190.

-11-

e.g., Sindell v. Abbott Labs., 607 P.2d 924, 936-38 (Cal.),

cert. denied, 449 U.S. 912 (1980). If a plaintiff prevails

in such a case, courts typically have limited each

defendant's liability to that portion of the plaintiff's

judgment which reflects the share of the market supplied by

the defendant at the time of said encounter. See, e.g., id.,

607 P.2d at 937. Market share liability has most often been

recognized in the context of DES cases. See, e.g., McCormack

v. Abbott Labs., 617 F. Supp. 1521 (D. Mass. 1985); McElhaney

v. Eli Lilly & Co., 564 F. Supp. 265 (D.S.D. 1983); Conley v.

Boyle Drug Co., 570 So.2d 275 (Fla. 1990); Hymowitz v. Eli

Lilly & Co., 539 N.E.2d 1069 (N.Y.), cert. denied, 493 U.S.

944 (1989); Martin v. Abbott Labs., 689 P.2d 368 (Wash.

1984); Collins v. Eli Lilly & Co., 342 N.W.2d 37 (Wis.),

cert. denied, 469 U.S. 826 (1984). But see Ray v. Cutter

Labs., 754 F. Supp. 193 (M.D. Fla. 1991) (product contained

HIV virus); Morris v. Parke, Davis & Co., 667 F. Supp. 1332

(C.D. Cal. 1987) (plaintiff harmed by DPT vaccine); Smith v.

Cutter Biological, Inc., 823 P.2d 717 (Haw. 1991) (product

contained HIV virus).

As noted above, the SJC did have occasion to

consider, by means of a certified question, the viability of

one form of market share liability in a DES case. See

Payton, 437 N.E.2d at 188-90. In Payton, plaintiffs argued

for market share liability with two significant twists: (1)

-12-

that they be allowed to proceed against and recover full

damages from only six named DES manufacturers despite the

fact that there was a larger number of potential tortfeasors,

and (2) that defendants should be prohibited from presenting

exculpatory proof. See id. at 188-89. The court rebuffed

these arguments, holding that two articulated reasons for the

identification requirement, (1) that wrongdoers be held

liable only for the harm they have caused, and (2) that

tortfeasors be separated from innocent actors, would be

disserved by the adoption of plaintiffs' theory. Id.

Accordingly, as we have stated, the SJC rejected plaintiffs'

version of market share liability. Id. at 189.

We accept for the sake of argument plaintiff's

assertions (1) that the SJC would, in some circumstances,

relax the identification requirement and allow a plaintiff to

recover under a market share theory; (2) that the SJC would

recognize market share liability in the lead poisoning

context; (3) that plaintiff has introduced sufficient

evidence for a reasonable factfinder to infer that her

injuries resulted from lead poisoning; (4) that lead paint

was, as one of plaintiff's experts puts it, at least "a

substantial contributing factor of her lead poisoning"; and

(5) that defendants, who were mere bulk suppliers of white

lead and did not manufacture or market the alleged injury-

causing paint, could still be adjudged to have acted

-13-

negligently towards plaintiff. Nonetheless, we believe that

the SJC's professed interest in both holding wrongdoers

liable only for the harm they have caused and in separating

tortfeasors from innocent actors is fatal to plaintiff's

claim.

Simply put, allowing plaintiff's market share claim

to proceed despite plaintiff's inability to pinpoint with any

degree of precision the time the injury-causing paint was

applied to the house on Leston Street would significantly

undermine both of the articulated reasons for the

identification requirement. The record before us reflects

that the layers of lead paint were applied to the house's

walls at various undeterminable points in time between 1917

and 1970.7 It also indicates that defendants' contributions

to the lead paint market varied significantly during this

time period. Given these facts, it is difficult to discern

the basis upon which any market share determination would be

premised.8 At any rate, it is evident that the adoption of

7Plaintiff did introduce expert testimony attempting to date
one of the multi-layered paint samples taken from the house.
However, this expert was only able to say that one layer of
lead paint probably was applied between 1933 and 1939, and
that a second layer of lead paint was probably applied
between 1955 and 1969.

8Apparently, plaintiff would have market share determined
according to an average of defendants' market shares over
time. Because such an approach would virtually guarantee a
deviation between liability and actual culpability for all
the named defendants, we are confident that the SJC would
look upon it with disfavor.

-14-

plaintiff's theory would not be consistent with the SJC's

admonition that wrongdoers be held liable only for the harm

they have caused.

Moreover, several of the defendants were not in the

white lead pigment market at all for significant portions of

the period between 1917 and 1970, and therefore may well not

have been market suppliers at the time the injury-causing

paint was applied to the walls of plaintiff's home. This, of

course, raises a substantial possibility that these

defendants not only could be held liable for more harm than

they actually caused, but also could be held liable when they

did not, in fact, cause any harm to plaintiff at all. Under

plaintiff's theory, therefore, tortfeasors and innocent

actors would not be adequately separated.

Finally, we note that the dicta relied upon by

plaintiff indicates that a relaxation of the identification

requirement to allow recovery against a negligent defendant

would only be appropriate to the extent that the recovery

represents "that portion of a plaintiff's damages which is

represented by that defendant's contribution . . . to the

market in the relevant period of time." Id. at 190 (emphasis

supplied). Here, as noted, plaintiff cannot identify with

adequate specificity the relevant period of time. Thus, it

appears that plaintiff's theory does not fall within even the

vague parameters mentioned in the SJC's dicta.

-15-

In sum, allowing plaintiff to recover her full

damages from the five named defendants despite her inability

to specify the time of their negligence may well, on this

record, do violence to the SJC's stated interest in ensuring

that wrongdoers be held liable only for the harm they have

caused. It also would create a substantial possibility that

tortfeasors and innocent actors would be impermissibly

intermingled. The SJC has made it abundantly clear that it

would not countenance either result. Accordingly, mindful

that federal courts sitting in diversity at a plaintiff's

election ought not "steer state law into unprecedented

configurations," see Martel, 992 F.2d at 1244, we affirm the

district court's grant of summary judgment to defendants on

plaintiff's market share claim.9

D. Concert of Action

Finally, plaintiff contends that the district court

erred in granting defendants summary judgment on her concert

of action claim. Again, we cannot agree.

9We are aware that the United States District Court for the
District of Massachusetts, relying on the dicta in Payton,

approved a market share theory of recovery in a DES case.
See McCormack, 617 F. Supp. at 1525-26. We note simply that

the McCormack case was never appealed and that we have not

had, nor do we now have, occasion to pass on the correctness
of its holding. We further note that the aspect of this case
upon which we rest our preclusion of plaintiff's market share
claim -- plaintiff's inability to identify the time of
defendants' alleged negligence -- was not present in
McCormack.

-16-

Plaintiff's concert of action claim is premised

upon the theory of liability set forth in Section 876 of the

Restatement (Second) of Torts (1977). In relevant part,

Section 876 (entitled "Persons Acting in Concert") provides:

For harm resulting to a third person from the
tortious conduct of another, one is subject to
liability if he

(a) does a tortious act in concert with the other
or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a
breach of duty and gives substantial assistance or
encouragement to the other so to conduct himself .
. . .

In isolated circumstances, Massachusetts courts have

indicated their willingness to permit recovery under theories

tracking the language of Section 876. E.g., Orszulak v.

Bujnevicie, 243 N.E.2d 897, 898 (Mass. 1969) ("Persons who

race automobiles on a public way are liable in negligence for

injuries caused by one of them."); Nelson v. Nason, 177

N.E.2d 887, 888 (Mass. 1961) (similar).

In essence, plaintiff claims that, "in light of the

substantial medical evidence of the unreasonable risk that

[lead paint] posed to young children[,]" certain of

defendants' actions as members of the LIA between 1930 and

1945 were tortious. Specifically, plaintiff points to

defendants' "initiat[ion of] nationwide promotional

campaigns, encourage[ment of] the use of white lead in house

paint through extensive advertising, [attempts] to undermine

-17-

the growing medical evidence of the danger of lead paint, and

work[] to prevent the enactment of governmental regulations

which would have restricted the use of white lead in painting

buildings."10 What is utterly lacking from her

presentation, however, is any evidence that these actions,

during the fifteen year period she identifies, had any role

in causing lead paint to be applied to the walls of her

childhood home. Even if we assume that at least some of the

lead paint consumed by plaintiff was applied to her home

during the period of defendants' alleged concerted actions,

there is no evidence that the application resulted from these

actions, or that it would not have taken place in the absence

of these actions. Cf. Roberts v. Southwick, 614 N.E.2d 659,

663 (Mass. 1993) (endorsing instruction defining proximate

cause as "that which, in continuous sequence, unbroken by a

new cause, produces an event, and without which the event

would not have occurred"). Thus, it is our view that the

factfinder could only have based a causation finding on

speculation or conjecture. Clearly, this is inappropriate

under Massachusetts law. See Goffredo v. Mercedes-Benz Truck

Co., 520 N.E.2d 1315, 1317-18 (Mass. 1988); Gynan v. Jeep

Corp., 434 N.E.2d 688, 691 (Mass. App. Ct.) (plaintiff "could

not leave causation merely to speculation and conjecture"),

10Plaintiff acknowledges, however, that she has no evidence
that defendants ever concealed information or introduced
false research into public debate.

-18-

review denied, 440 N.E.2d 1177 (Mass. 1982); see also W. Page

Keeton et al., Prosser and Keeton on Torts 41, at 269 (5th

ed. 1984) ("The plaintiff must introduce evidence which

affords a reasonable basis for the conclusion that it is more

likely than not that the conduct of the defendant was a cause

in fact of the result. A mere possibility of such causation

is not enough; and when the matter remains one of pure

speculation or conjecture, or the probabilities are at best

evenly balanced, it becomes the duty of the court to direct a

verdict for the defendant.").

We acknowledge that the question of causation is

generally for the factfinder. See Mullins v. Pine Manor

College, 449 N.E.2d 331, 338 (Mass. 1983). Where there is no

evidence from which the factfinder, without speculating, can

find causation, however, the case is appropriately kept from

the jury. See Goffredo, 520 N.E.2d at 1318. We believe that

this is such a case. Accordingly, we affirm the district

court's decision to award defendants summary judgment on

plaintiff's concert of action claim.11

11We recognize that the district court based its summary
judgment decree on the fact that plaintiff was unable to
identify any of the defendants specifically as tortfeasors.
See Santiago, 794 F. Supp. at 33. We also recognize that

plaintiff has spent much effort challenging this ruling. As
noted above, however, we are free to affirm the entry of
summary judgment on any independently sufficient ground made
manifest by the record. One Parcel of Real Property, 960

F.2d at 204. Because we do so here, we do not reach the
correctness of the district court's decision.

-19-

III.

CONCLUSION

Because certification to the SJC of the issues

raised in this appeal would be inappropriate, plaintiff's

request therefor is denied. Furthermore, because the

district court correctly ruled that plaintiff's market share

and concert of action claims fail as a matter of law, we

affirm its granting of defendants' motions for summary

judgment thereon.

Affirmed. Costs to appellees.

-20-