**Margaret Gray BLY, Personal Representative of the Estate of Leo Medford Bly, Decedent,**

**and**

**Debra D. Seals, Personal Representative of the Estate of Edward Seals, Decedent, Appellants,**

**v.**

**TRI–CONTINENTAL INDUSTRIES, INC., et al. Appellees.**

**No. 93–CV–547.**

District of Columbia Court of Appeals.

Argued May 16, 1994.

Decided Aug. 21, 1995.

---

Alan F. Post, Bethesda, MD, for appellants.

David P. Durbin, with whom James F. Jordan, Washington, DC, was on the brief, for appellee Steuart Petroleum Company.

Forest A. Nester, Washington, DC, for appellee Warex Petroleum Company.

Stephen A. Horvath, with whom Melissa S. Hogue, Fairfax, VA, was on the brief, for appellee Mansfield Oil Company of Gainesville, Inc.

Barbara A. Milnamow, with whom Joe G. Hollingsworth, and Bruce J. Berger, Wash-

ington, DC, were on the brief, for appellee Marathon Petroleum Company.

Jeffrey E. Boothe, Washington, DC, with whom Laurence F. Janssen, Kathryn Janssen, and Janet H. Kwuon, Los Angeles, CA, were on the brief, for appellee Chevron, U.S.A.

Jeffrey K. Sherwood, with whom Michael S. Marcus, Joseph P. Esposito, Michael J. Mueller, and Cheryl A. Falvey, Washington, DC, were on the brief, for appellee Amoco Oil Company, et al.

Before WAGNER, Chief Judge,[*] and FERREN, and KING, Associate Judges.

WAGNER, Chief Judge:

Appellants, Margaret Gray Bly, personal representative of the estate of Leo Medford Bly, deceased, and Debra D. Seals, personal representative of the estate of Edward Seals, deceased, filed actions in the trial court against appellees and others contending that the decedents died from leukemia caused by their exposure to benzene contained in petroleum products either manufactured or supplied by appellees. Appellants alleged that Bly and Seals were exposed to the lethal products in the course of their work as automotive mechanics for the District of Columbia Department of Public Works (DPW) over the course of many years. The trial court granted summary judgment in favor of appellees Mansfield Oil Company of Gainesville, Inc. (Mansfield), Amoco Oil Company (Amoco), Texaco, Inc., (Texaco) and Steuart Petroleum Company (Steuart). The trial court also granted motions to dismiss in favor of Ashland Oil, Inc. (Ashland), Atlantic Richfield Company (Atlantic), BP Exploration & Oil, Inc. (BP), Citgo Petroleum Corporation (Citgo), Crown Central Petroleum Corporation (Crown), Fina Oil and Chemical Co. (Fina), Marathon Petroleum Company (Marathon), Mobil Oil Corporation (Mobil), Sun Refining and Marketing Company (Sun), Tenneco Oil Company (Tenneco), Chevron,

U.S.A. Inc. (Chevron), and Warex Petroleum Corporation (Warex) (collectively along with Amoco, Steuart and Texaco referred to herein as Amoco Oil, *et al.*).[1] In arguing for reversal, appellants raise an issue of first impression. They contend that this jurisdiction should adopt a version of the burden shifting rule known as "alternative liability" which on the facts presented would require appellees, as the negligent distributors of hazardous products, to meet the burden of proving that their products did not contribute to appellants' decedents' injuries and deaths. We conclude that the record on appeal does not support adoption of the novel variation on the theory of alternative liability which appellants advance or show that the trial court erred in its rulings. Therefore, we affirm.

## I.

Appellants' decedents, Leo Medford Bly and Edward Seals, were employed as automotive mechanics by the District of Columbia Department of Public Works from 1959 through 1979 and 1949 through 1978 respectively. During the course of their employment, both men were exposed to gasoline containing benzene. Appellants alleged in their complaints that appellees produced, refined, manufactured, marketed, and distributed gasoline containing benzene, that they knew that this substance caused leukemia and other diseases of the blood, and that they provided no warnings regarding the risks of exposure to the products.[2] According to the complaints, Seals was diagnosed with leukemia in October 1988 as a proximate result of which he died on June 15, 1991; Bly was diagnosed with the same illness on or about November 1, 1991 as a proximate cause of which he died on November 21, 1991. Appellants set forth in their complaints as theories for recovery against appellees, negligence, strict liability, creation of an ultra hazardous condition, and breach of implied warranties.

---

[*] *Judge* WAGNER was an *Associate Judge* of this court at the time of argument. Her status changed to *Chief Judge* on June 14, 1994.

[1.] These appellees filed a joint brief on appeal addressing the same issues.

[2.] Appellants filed amended complaints on April 4, 1994 in which they added some of the appellees who had not been joined previously.

For purposes of discovery and pre-trial proceedings, appellants' cases were consolidated with three similar actions in the trial court which had been filed in 1990.[3] Subsequently, the court extended the time for discovery until September 30, 1992 on the issue of products identification (i.e., determining to which companies' gasoline appellants were exposed). Appellants concede that they were unable to ascertain during discovery "any significant evidence of who supplied the District Government with gasoline at any time prior to 1980."

Appellees Amoco, et al. filed a motion to dismiss on August 14, 1992 on the ground that, after nearly two years of discovery in the Bradley–Carter–Taylor litigation, there was no evidence linking Amoco, et al. to sales of gasoline to DPW during the period relevant to the Bly–Seals claims, i.e., 1959 through 1979 and 1949 through 1978 respectively. Citgo also filed a motion to dismiss on that date. Appellants' counsel sought to continue a hearing on the motions in order to speak with a potential witness, and he informed counsel for the appellee, Amoco, et al. by letter dated August 26, 1992 "that if in fact we have no evidence by the conclusion of the product identification phase, we will [e]nter into dismissal with you as to any defendants where there is no evidence." Counsel for appellants sent a similar letter to counsel for Mansfield. The Amoco, et al. appellees agreed to an extension of time for the hearing on the motion to dismiss. On September 18, 1992, the court granted the motion as unopposed. Appellants filed a motion for reconsideration, and the trial court vacated the order dismissing the case and subsequently considered the motion on the merits.

Amoco, et al. deposed appellants' product identification witness, Herman Ginwright, who had been identified in the Bradley–Carter–Taylor cases. Mr. Ginwright testified that he held various jobs with the District between 1960 to 1968. During that period, he sometimes ordered gasoline for his department, and he remembered contacting several suppliers of gasoline, including Amoco, Texaco, and Esso.[4] Mr. Ginwright testified that he placed orders for gasoline around 1968, but he did not do so in the 70's. He could not recall if he placed orders in 1969. He thought that he might have also ordered from Shell, which is not a party, and Gulf. However, Mr. Ginwright did not know the source of each suppliers' gasoline or how much gasoline was delivered. Mr. Ginwright could not recall what an Amoco truck looked like, but he could recall something about the appearance of the Esso and Texaco trucks. He did not know how often such trucks made deliveries. The trial court found that Mr. Ginwright's poor memory about these events was not enough to raise a genuine issue identifying Amoco, Texaco or Chevron and Gulf as sources of the gasoline to which appellants claimed they were exposed.

Steuart filed a motion for summary judgment supported by the undisputed deposition testimony of Leonard P. Steuart, the Chairman of the Board and former Chief Executive Officer of Steuart from 1976–1990. Steuart testified that the company had never manufactured or produced gasoline since he came to the company. Although Steuart had purchased a gasoline terminal in the District of Columbia, it had never operated it. According to the witness, Steuart entered the wholesale gasoline distribution business after 1976. By an agreement of October 13, 1982, Steuart agreed to supply gasoline to Tri–Continental. Steuart also thought that it

---

3. The three actions were *Bradley v. Tri–Continental Industries, Inc., et al.*, C.A. No. 90–11383, *Carter v. Tri–Continental Industries, Inc., et al.*, C.A. No. 90–11384, *Taylor v. Tri–Continental Industries, Inc., et al.*, C.A. No. 90–11385. Appellants' counsel in this case also appeared as counsel in the consolidated actions. In appellants' motion to consolidate, they stated that "all of the discovery which had taken place to date is equally applicable to these two new cases [Bly and Seals] as it is to the original three." The claims in the cases were indeed virtually identical ex-

cept for the periods of plaintiffs' exposure and the consequences to Taylor, who survived, but was gravely ill. It is alleged that each of the plaintiffs in the cases worked as automobile mechanics for the D.C. Department of Public Works during the following periods: Henry Bradley, 1966–1986, Roosevelt Carter, 1979–1987, and Stanley Taylor, 1972–1989.

4. Esso, which later became Exxon, is not a party to these cases.

provided to Tri–Continental gasoline which was sold to the District during 1980 and the period 1982 to 1986. Steuart had no comprehensive records for the period 1968 to 1985 because of its record retention policy, and it had no records or information showing any deliveries or sales by Steuart of petroleum products to the District before 1982.

Warex, a wholesale distributor of petroleum products, responded to interrogatories that it never sold petroleum products to the District government. Other discovery indicated that in the late 1980's the District received some gasoline from Warex. Bly and Seals did not work for the District during the period that Warex and Steuart provided gasoline products to the District.

Appellee Mansfield filed a motion to Dismiss or in the Alternative for Summary Judgment accompanied by a supporting affidavit of its president, Michael Mansfield. Mr. Mansfield stated that the company had never supplied petroleum products either directly or indirectly to the D.C. government prior to 1980, the period relevant to appellants' claims. Appellants did not challenge Mansfield's statement of material facts as to which there was no dispute. In the supporting affidavit, Mansfield averred that the company never made any sales of petroleum products to Steuart or the District before 1980, and it never made shipments or sales to Virginia prior to that time.[5] The trial court granted Mansfield's motion.

Appellants were not able to discover any evidence connecting Marathon's products to products used by the District during the period relevant to their cases either. Marathon filed a motion to dismiss incorporating by reference the brief of the Amoco, et al. appellees. The trial court granted Marathon's motion.

In opposition to Marathon's motion to dismiss, appellants filed the affidavit of Arnold E. Safer, an economist with experience particularly in the gasoline market. According to Dr. Safer's affidavit, gasoline is manufactured by more than 100 refining companies in the United States, and it is possible that the products of these manufacturers could end up in one of the terminals in the District of Columbia area. He averred that by the time gasoline reaches the service station and consumer, it could include the products of numerous manufacturers. Dr. Safer stated that the gasoline to which Bly and Seals may have been exposed could have come from anywhere in the United States or even from other countries and that it would not be possible to know which refiner manufactured the gasoline. According to Dr. Safer, once gasoline is graded by the refiner, gasoline of the same grades may be mixed, and the identity of the manufacturer may be lost totally. He concluded that "[w]hen an end-user, such as the District of Columbia purchases gasoline over a number of years from several suppliers, it is impossible to identify the actual manufacturer of any given quantity."

In summary, the trial court dismissed the cases of the appellees which are referred to herein as the Amoco, et al. appellees because it "was persuaded that a market shares theory of liability has not been recognized in the District of Columbia in circumstances relevant to this case, that alternative liability ... is not applicable to the facts outlined in the pleadings in this case." The court granted summary judgment for Amoco, Texaco, Mansfield, and Steuart on the basis of the more complete record before the court.

## II.

Appellants contend that the trial court erred in disposing of their claims summarily in spite of the lack of evidence as to which of the appellees' products their decedents were exposed at a given time. They argue that this jurisdiction should recognize the burden shifting rule known as "alternative liability," as set forth in the RESTATEMENT OF TORTS (2d) 433B(3) (1965), which they contend would allow recovery on their claims where it is impossible to identify which appellees supplied the dangerous product which caused their decedents' illnesses and deaths.

---

**5.** Apparently, appellants or plaintiffs in the consolidated cases had alleged that some petroleum products supplied to the District may have been shipped by Steuart from a terminal in Fairfax, Virginia.

Appellees Amoco, *et al.* argue that appellants' theory is not based upon the typical "alternative liability" concept, but rather upon a theory known as "market share" liability, which would improperly make each appellee an insurer of the conduct of others in the industry whether or not they have been brought before the court. They contend that appellants have failed to develop a record which would justify the abrogation of traditional tort law which requires proof of causation as a condition of recovery. Alternatively, Amoco, *et al.* contend that it was only after discovery had been completed and the trial court had granted the motions to dismiss that appellants advanced this novel theory; therefore, they should be precluded from presenting it.

Appellee Marathon argues that the trial court properly dismissed the case against them as appellants failed to produce any evidence that Marathon was a supplier or manufacturer of gasoline to which their decedents were exposed. Marathon also contends that even if market share were a viable theory of liability, it is inapplicable where, as here, specific suppliers can be identified. Appellee Mansfield takes the position that appellants failed to demonstrate any genuine issues of material facts which precluded summary judgment in their favor and that an alternative liability theory is not applicable to the facts of this case.

■ Before addressing these arguments, we first examine generally the legal principles upon which they are based. The general principles of tort law which are followed in this jurisdiction require that a plaintiff prove by a preponderance of the evidence a causal link between the tortious act and the plaintiff's injury. *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 199 (D.C.1991); *District of Columbia v. Freeman*, 477 A.2d 713, 716 (D.C.1984); *District of Columbia v. Frick*, 291 A.2d 83, 84 (D.C.1972). This rule also applies generally in product liability cases. *See Tidler v. Eli Lilly & Co.*, 271 U.S.App.D.C. 163, 166, 169, 851 F.2d 418,

421, 424 (D.C.Cir1988); *see also Catrett v. Johns–Manville Sales Corp.*, 263 U.S.App. D.C. 399, 406, 826 F.2d 33, 40 (D.C.Cir.1987), *cert. denied*, 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988).

■ Appellants concededly cannot meet this burden of proof. Therefore, they seek to have this court recognize an exception to the general principles of tort law which govern these cases. They characterize the theory in terms of "alternative liability," which has been recognized and applied narrowly in this jurisdiction under exceptional circumstances. *See Bowman v. Redding & Co.*, 145 U.S.App.D.C. 294, 306, 449 F.2d 956, 967 (D.C.Cir.1971). However, appellants cannot bring themselves within the requirements of *Bowman* as a review of the case will show. In *Bowman*, which is not binding on this court,[6] the D.C. Circuit court applied in a negligence case the rule extracted from the RESTATEMENT OF TORTS which appellants urge this court to adopt here. The theory as set forth in the RESTATEMENT and applied in *Bowman* is as follows:

> Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there was uncertainty as to which one has caused it, the burden is upon each actor to prove that he has not caused the harm.

RESTATEMENT, § 433B(3).

In *Bowman*, the trial court directed a verdict for the defendants in a wrongful death case where it was claimed that the decedent's death was proximately caused by the negligence of the employees of two different companies. 145 U.S.App.D.C. at 296, 449 F.2d at 958. In *Bowman* there was some evidence which entitled plaintiff to have the jury determine whether either of the two defendants could have avoided the decedent's death after he came to a position of peril. 145 U.S.App. D.C. at 301, 449 F.2d at 963. The court determined that the RESTATEMENT'S pronouncement could be applied in the interest of justice and consistent with sound common

---

**6.** This court accepts as binding precedent decisions of the United States Court of Appeals for the District of Columbia Circuit rendered prior to February 1, 1971. *M.A.P. v. Ryan*, 285 A.2d 310, 313 (D.C.1971). The decision in *Bowman* was entered on February 16, 1971, with a petition for rehearing denied on June 2, 1971.

law principles. *Bowman,* 145 U.S.App.D.C. at 306, 449 F.2d at 968. In reversing and remanding the case for proceedings consistent with its holding, the court determined that the burden would only shift to the defendants "if the jury should decide that it is satisfied that plaintiff has established by a preponderance of the evidence that both defendants were wrongdoers, and that one or another was the cause of [plaintiff's] death, but is unable to find from a preponderance of the evidence which defendant was a cause of death." 145 U.S.App.D.C. at 306, 449 F.2d at 968. The court went on to explain that when the rule is applied, it is up to each defendant to absolve itself of liability, and if neither can prove that it did not cause the plaintiff's death, both would be liable. *Id.* In this case, appellants cannot avail themselves of the burden-shifting rule of *Bowman* because of their inability to adduce evidence that all defendants were wrongdoers and one or another caused their deaths. *See id.*

In *Battocchi v. Washington Hosp. Ctr.,* 581 A.2d 759 (D.C.1990), this court affirmed the trial court's refusal to give a burden-shifting instruction in a medical malpractice case where, on the facts of the case, the appellants "could not prove with the requisite degree of factual certainty that, assuming both doctors were negligent, the negligence of only one or the other caused the injury, but not both." This court explained that

> The *Bowman* shift is an equitable tool used to resolve a dilemma on the jury's part that could lead to nonrecovery by an obviously deserving plaintiff: the impossibility of determining which of multiple defendants caused the injury when it is clear that *all* were negligent, but only *one* could possibly be the proximate cause. Conversely, if there is no reasonable possibility that the jury will face that dilemma on the evidence presented, the instruction is not needed and ordinary instructions on concurrent proximate causation suffice, because the plaintiff can readily meet his burden by showing that the negligence of both actors substantially contributed to the injury.

581 A.2d at 770. Thus, this court explained, if the negligence of one or both defendants proximately caused the injury, plaintiffs would be entitled to a verdict, and it would not be necessary to apply "the extraordinary measure of shifting the burden of proof on causation." *Id.* at 771. As further reason for its ruling, this court acknowledged that the exception had been limited to situations where all tortfeasors had been joined in the action. *Id.* In *Battocchi,* only one of the two physicians who were allegedly negligent was before the court. The court found that this circumstance undermined the premise for the shift, *i.e.,* that both defendants would be forced to speak out in order to protect themselves, and by doing so, they would reveal the culpable party. *Id.* (citing *Hymowitz v. Eli Lilly & Co.,* 73 N.Y.2d 487, 541 N.Y.S.2d 941, 946, 539 N.E.2d 1069, 1074, *cert. denied,* 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989).

Appellants concede that they are unable to identify the source of the gasoline to which their decedents were allegedly exposed. Therefore, they cannot "adduce evidence from which a jury could reasonably conclude that [any specific appellee's] product proximately caused their injuries." *Tidler, supra,* 271 U.S.App.D.C. at 166, 851 F.2d at 421. They cannot avail themselves of even the "Bowman shift," since they are unable to produce evidence that any of the defendants were negligent and that one or another caused the decedents' deaths. *See Bowman, supra,* 145 U.S.App.D.C. at 306, 449 F.2d at 968; *see also Battocchi,* 581 A.2d at 770. Since they lack an essential element of a traditional products liability claim, they urge this court to adopt a so-called "non-identification" theory of liability which has been permitted in only a few jurisdictions in other products liability cases such as those involving injuries caused by asbestos, blasting caps, blood products containing the AIDS virus, and diethylstilbestrol (DES). Specifically, appellants advance a market share theory of liability.

Market share liability was created to overcome one of the problems encountered in applying alternative liability in DES cases, *i.e.,* the failure or inability to bring all possible producers of the substance before the court. *See Mulcahy v. Eli Lilly & Co.,* 386

N.W.2d 67, 74 (Iowa 1986). The highest courts of a few states have adopted some version of market share liability, mostly in DES cases.[7] *See Sindell v. Abbott Labs.*, 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, *cert. denied*, 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980) (DES); *Conley v. Boyle Drug Co.*, 570 So.2d 275 (Fla.1990) (DES); *(John) Smith v. Cutter Biological, Inc.*, 72 Haw. 416, 823 P.2d 717 (1991) (blood products); *Hymowitz, supra*, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (DES); *Martin v. Abbott Labs.*, 102 Wash.2d 581, 689 P.2d 368 (1984) (DES); *Collins v. Eli Lilly Co.*, 116 Wis.2d 166, 342 N.W.2d 37 (1984) (DES). The market share liability concept was first articulated in *Sindell.*

In *Sindell,* the California Supreme Court addressed the issues whether a plaintiff should be required to identify the manufacturer which supplied DES to her mother or join all manufacturers of the product in order to recover for injuries she sustained as a result of its use. 163 Cal.Rptr. at 144, 607 P.2d at 936. In the context presented, where all defendants produced DES from an identical formula, and where the manufacturer which caused plaintiff's injuries could not be identified, the court held that it would be sufficient for plaintiff to join as defendants a substantial percentage of the manufacturers in the market. *Id.* at 144–45, 607 P.2d at 936–37. The burden would then shift to the defendants to demonstrate that their product did not injure plaintiff. *Id.* The court was persuaded on policy grounds that a plaintiff states a cause of action in such cases because "as between an innocent plaintiff and negligent defendants, the latter should bear the cost of the injury," and "defendants are better able to bear the cost of injury resulting from the manufacture of a defective product," and that "holding [a manufacturer] liable for defects and failure to warn of harmful effects will provide an incentive to product safety." *Id.* at 144, 607 P.2d at 936.

The *Sindell* court held that plaintiff must join as parties the manufacturers of a substantial share of the product which plaintiff

claims caused the harm and meet the burden as to all other elements of the claim. *Id.* at 145, 607 P.2d at 937. The burden of proof then shifts to the defendants to demonstrate that they could not have manufactured the product. *Id.* If a defendant fails to meet this burden, it is held liable "for the proportion of the judgment represented by its share of that market." *Id.* The intended result of this approach is that each manufacturer's liability would be approximately equivalent to the damages caused by the product it manufactured. *Id.* at 146, 607 P.2d at 938.

The Supreme Court of California subsequently held that a plaintiff may not proceed on claims for breach of warranty or fraud on a market share theory because that would be inconsistent with their rule against strict liability for injuries caused by product defects not known or knowable at the time of distribution. *Brown, supra* note 7, 245 Cal.Rptr. at 425, 751 P.2d at 484. The *Brown* court also clarified some of the *Sindell* principles. It concluded that the "relevant" market was a national market and that a defendant's liability is several only, and limited to its market share. *Id.* In limiting recovery to several liability, the California Supreme Court sought to protect defendants against excessive liability while holding them responsible to the extent approximately that their harmful products were in the market. *Id.* at 428, 751 P.2d at 486. "In short, the imposition of joint liability among defendant manufacturers in a market share action would frustrate [the] goal of achieving a balance between the interests of DES plaintiffs and manufacturers of the drug." *Id.* at 429, 751 P.2d at 487.

The Washington, Wisconsin, and Florida Supreme Courts adopted market share liability based on substantially the same policy considerations as expressed in *Sindell.* The approaches of these courts differ, however, with respect to the requirement of a "substantial share" and in the manner of apportionment of damages among defendants. The Wisconsin Supreme Court held that a

---

**7.** These cases involved litigation against the manufacturers of DES, a prescription drug used to prevent miscarriages which it was alleged harmed the various plaintiffs *in utero. See, e.g.,*

*Brown v. Superior Court (Abbott Laboratories),* 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470 (1988).

plaintiff in a DES case could state a cause of action for injuries by naming only one defendant, provided the complaint also alleged: (1) that her mother took DES which caused her injuries; (2) that the defendant produced and marketed the types of DES taken by plaintiff's mother, and (3) that the defendant breached a legally recognized duty in marketing the product. *Collins, supra,* 342 N.W.2d at 50. The Wisconsin court was of the view that practical considerations favored allowing a plaintiff to proceed, initially at least, against one defendant. It rejected the "substantial share" concept as unworkable because of the difficulty in trying to establish the relevant market and each defendant's market share.

The Supreme Court of Washington accepted a modified alternate liability theory along the lines of the *Sindell* market-share approach in a DES case. *Martin, supra,* 689 P.2d at 381. Like the Wisconsin court, the *Martin* court held that a plaintiff need only file suit against one defendant, provided the plaintiff alleged essentially the same elements identified in *Collins. See Martin,* 689 P.2d at 382; *see also Collins,* 342 N.W.2d at 50. The *Martin* court reasoned that all distributors of DES contributed to the injury to the public, even if not to plaintiff's actual injury, and that it was better to place the burden on the drug companies than consumers in this situation. However, the court held that defendants could relieve themselves from liability by establishing by a preponderance of the evidence that: they did not produce or market the particular type of DES taken by plaintiff's mother; that they did not market the DES in the geographic market area where plaintiff's mother obtained the drug; or that they did not distribute DES in the time period plaintiff's mother ingested the drug. 689 P.2d at 382.

The Florida Supreme Court adopted the *Martin* approach to market share liability, with two exceptions. *Conley, supra,* 570 So.2d at 286. First, "as a prerequisite to its use, a plaintiff must make a showing that she has made a genuine attempt to locate and to identify the manufacturer responsible for her injury." *Id.* Second, the court "restrict[ed] this vehicle of recovery to those actions

sounding in negligence; it may not be used in conjunction with allegations of fraud, breach of warranty or strict liability." *Id.*

New York adopted the market share theory using a national market for DES cases and apportioned liability to correspond to the over-all culpability of each defendant. *Hymowitz, supra,* 541 N.Y.S.2d at 949, 539 N.E.2d at 1078. However, a defendant would not be held liable if it did not participate in the marketing of DES sold for pregnancy use. *Id.* Because the theory of liability which the court adopted is not based on causation in a particular case, but rather on the over-all risk produced, a defendant member of the market would not be exculpated by the mere fact that it did not cause a particular plaintiff's injury. *Id.*

Hawaii's Supreme Court adopted national market share liability in a blood products case and held that it was immaterial whether the plaintiff joins one or all manufacturers. *Id.,* 823 P.2d at 729. *(John) Smith, supra,* 823 P.2d at 729. A defendant could avoid liability by proving that it had no product in the market at the time of the injury. *Id.*

Other states have rejected the theory, even for DES cases, and it has been criticized widely. *See, e.g., Mulcahy, supra,* 386 N.W.2d at 67; *(Sandra) Smith v. Eli Lilly & Co.,* 137 Ill.2d 222, 148 Ill.Dec. 22, 560 N.E.2d 324 (1990); *Zafft v. Eli Lilly & Co.,* 676 S.W.2d 241 (Mo.1984) (en banc); *Gorman v. Abbott Labs.,* 599 A.2d 1364 (R.I.1991). The Illinois Supreme Court rejected the theory as unsound and as too great a deviation from existing tort principles. *(Sandra) Smith,* 148 Ill.Dec. at 35, 560 N.E.2d at 337. It declined to hold that creation of the risk without causation was grounds for liability. *Id.* at 41–42, 560 N.E.2d at 343–44. The court's other reasons for not accepting the market share theory were: (1) the lack of reliable information to establish the defendants' percentages of the market; (2) the burden on the court system and litigants in attempting to establish market percentages based on unreliable or insufficient information; (3) the arbitrariness and wide variances between judgments without sufficient explanations for the differences; (4) the unfairness and speculativeness of imposing liability when the com-

pany which actually sold the product is not before the court; (5) the difficult burden of establishing the shares of those not before the court; and (6) the potential of treating differently plaintiffs who cannot identify the specific manufacturers responsible and those who can. *Id.* at 36, 560 N.E.2d at 338–39. The Illinois court also concluded that market share liability broadens manufacturers' liability exposure, requiring them to become insurers for others in the industry, which might diminish their participation in the market as well as drug research. *Id.* at 39–40, 560 N.E.2d at 341–42. The court rejected the rationale that the theory would provide an incentive to produce safer generic drugs or to maintain more detailed records. *Id.* at 40–41, 560 N.E.2d at 342–43. The court was of the view that the adoption of market share liability is more appropriate for the legislature to develop, with its added ability to hold hearings and determine public policy. *Id.* at 40, 560 N.E.2d at 342.

The Iowa Supreme Court rejected the theory on "a broad policy basis," concluding that "awarding damages to an admitted innocent party by means of a court-constructed device that places liability on manufacturers who were not proved to have caused the injury involves social engineering more appropriate within the legislative domain." *Mulcahy, supra,* 386 N.W.2d at 76. Accordingly, the Iowa court adhered to the requirement that a plaintiff in a products liability case prove that the claimed injury was caused by a product manufactured or supplied by the defendant. *Id.* at 75–76. Similarly, the Missouri Supreme Court rejected the theory, concluding that it would substantially alter the existing rights and liabilities of the parties without sufficient justification to abandon fundamental concepts of tort law. *Zafft, supra,* 676 S.W.2d at 247. Accordingly, the Missouri court adhered to the requirement of Missouri tort law "which requires a causal relationship between the defendants and the injury-producing agent as a precondition to maintenance of their causes of action." *Id.*

In affirming the grant of summary judgment in a DES case where the plaintiffs could not prove the conduct of the defendant which proximately caused their injury, the D.C. Circuit Court rejected a market share approach. *Tidler, supra,* 271 U.S.App.D.C. at 169, 851 F.2d at 424. The court stated that, whether applying the law of Maryland or the District of Columbia, plaintiff's theory would require building on a new foundation, rather than "on the underpinnings of the traditional common law of torts." *Id.* The court also observed that "[a] common law decision having such a marked effect on the known public policy of the jurisdictions concerned, even if it is within the power of a state court, is surely beyond the authority of a federal court applying state law." *Id.*

## III.

Appellees urge this court to reject market share liability on the grounds that: (1) it is a radical departure from this jurisdiction's traditional tort law; (2) there is no legislative authority for adoption of the theory; (3) the theory makes each defendant an insurer of the conduct of the entire industry, regardless of whether the proper defendants have been sued; (4) the majority of jurisdictions have rejected the theory; and (5) the record in this case does not afford an appropriate basis for adoption of the theory. Because we resolve the issues on the basis of the last contention, we do not consider the other grounds advanced by appellees.

### A. *The Case Against Mansfield*

■ The trial court properly granted Mansfield's motion for summary judgment because appellants failed to show by responsive affidavit or otherwise that there was a genuine issue of fact for trial on common law tort theories or even on the market share theory which appellants advance. *See Beard, supra,* 587 A.2d at 198. Mansfield established in the supporting affidavit of its president that it made no sales of petroleum products to DPW or to any terminals or distribution centers which supplied gasoline to the District government or its agencies prior to 1980, the time relevant to appellants' exposure to the products which resulted in their injuries and deaths. Appellants did not challenge Mansfield's statements of material facts as to which it claimed there was no genuine dispute nor its supporting documen-

tation. Subsequent to the trial court's ruling, appellants filed the affidavit of Arnold Safer in support of their motion for reconsideration. Even assuming the propriety of its consideration at that stage of the proceedings, it would not alter the outcome. Mr. Safer's conclusory assertions that Mansfield was likely to or might have supplied the region is insufficient to create a triable issue of fact where the opposing party has provided affirmative evidence to the contrary. *See Spellman v. American Sec. Bank,* 504 A.2d 1119, 1123 (D.C.1986).

On this record, summary judgment was appropriate because Mansfield provided evidence that its products were not included in those to which appellants were exposed, and appellants will not be able to prove that the decedents' illnesses which caused their deaths can be traced to Mansfield's products. Appellants cannot establish under general principles of tort law the requisite causal link between any act or omission or product of Mansfield and appellants' deaths. *See Beard, supra,* 587 A.2d at 199; *Frick, supra,* 291 A.2d at 84; *Catrett, supra,* 263 U.S.App. D.C. at 406, 826 F.2d at 40. Even assuming the applicability of the alternative liability theory extracted from the RESTATEMENT or the market share theory which appellants propose, appellants were not entitled to prevail against Mansfield's motion for summary judgment on this record.

The so-called *Bowman* burden-shifting rule requires that there be a showing in the first instance that all defendants were negligent. *Battocchi, supra,* 581 A.2d at 770; *Bowman, supra,* 145 U.S.App.D.C. at 301, 449 F.2d at 963. Since Mansfield was able to show that it was not involved in any tortious conduct at the time relevant to the harmful exposure of appellants' decedents, appellants would not be entitled to shift the burden to Mansfield to prove that it had not caused the harm. *Battocchi,* 581 A.2d at 770; *Bowman,* 145 U.S.App.D.C. at 301, 449 F.2d at 963. Moreover, the evidence offered in support of Mansfield's motion for summary judgment establishes that it had not caused the harm. Thus, appellants fare no better against this appellee on a market share theory because even under that theory, a defendant can ex-

culpate itself by proving that it could not have caused the plaintiff's injuries. *See, e.g., Sindell, supra,* 163 Cal.Rptr. at 145, 607 P.2d at 937 (manufacturer can relieve itself of liability by demonstrating it could not have made the product which caused plaintiff's injuries); *Martin, supra,* 689 P.2d at 382 (defendants in DES case entitled to exculpate themselves from liability by establishing they did not market in geographic area where plaintiff's mother obtained the drug); *Conley, supra,* 570 So.2d at 275 (defendant may exculpate itself by proving it did not produce or market in relevant geographic market area or during time period of ingestion of DES); *Hymowitz, supra,* 541 N.Y.S.2d at 950, 539 N.E.2d at 1078 (defendant not liable if it established it did not participate in marketing DES for pregnancy use or was not a member of the market of DES sold for pregnancy use); *see also (John) Smith, supra,* 823 P.2d at 729 (exculpation allowed where a defendant proves that it had no product on the market at the time of the injury). In summary, the record does not support appellants' claim against Mansfield on common law tort theories, alternative liability, or the market share theory advanced, and the trial court properly granted summary judgment in favor of Mansfield.

### B. The Cases Against Marathon and Amoco, et al.

■ Like Mansfield, the record shows no evidence that Marathon supplied or manufactured gasoline which was delivered to the District of Columbia government between 1949 and 1979, the period of Bly's and Seals' claimed exposure. After extensive identification discovery, appellants do not contend that they have any evidence that they were exposed to Marathon's products. Thus, dismissal was clearly appropriate under tort law principles which require proof that the product alleged to have caused a plaintiff's injury can be traced to the manufacturer. *Freeman, supra,* 477 A.2d at 716; *Catrett, supra,* 263 U.S.App.D.C. at 406, 826 F.2d at 40. However, appellants contend that they should be allowed to proceed against those manufacturers and suppliers who can be identified as having supplied petroleum prod-

ucts to which Bly and Seals were exposed as well as those who were not.

■ Again, assuming a market share theory were acceptable in the District, it is apparent that appellants are faced against Marathon with the same problem faced against Mansfield. However, the trial court did not dismiss the case against Marathon on the basis of the expanded record on summary judgment, which disclosed appellants' ability to identify some manufacturers and suppliers of gasoline and Marathon's absence from the market at the relevant time.[8] The trial court ruled alternatively that market share theory had not been recognized in the District of Columbia in the circumstances relevant to this case and it was not applicable to the facts as outlined in the pleadings. We agree. The reasons for this conclusion are applicable to the cases against Amoco, *et al.* as well, and we consider them together.

Appellants' complaints alleged traditional common law tort and products liability claims. After extensive discovery, appellants concede that they were unable to discover "any significant" evidence of who supplied the District government with gasoline at any time prior to 1980, when Bly and Seals were exposed to it. Indeed, appellants identify no evidence that any of appellees actually supplied the product to which decedents' were exposed at the relevant time period. Thus, they would be unable to recover under traditional principles which require proof of a causal connection between the defendant's tortious act and the resulting injury. *Freeman, supra,* 477 A.2d at 716; *Frick, supra,* 291 A.2d at 84. After the trial court granted appellees motion to dismiss, appellants urged the court to consider an alternative theory of liability.

This court has previously rejected the alternative liability theory of burden shifting set forth in *Bowman* where one negligent tortfeasor was not joined in the case. *Battocchi, supra,* 581 A.2d at 770–71. Moreover, the *Bowman* shift has been held applicable only where all defendants are wrongdoers

and one or the other, but not all, caused the injury, and it cannot be determined from the evidence which caused the injury. *Id.* at 769. Appellants have not developed evidence that all or any of the appellees breached any duty of care to Bly or Seals, that only certain of those among them caused the injury, or that those who contributed to their injuries cannot be ascertained. Thus, as appellants apparently concede, they cannot make out a claim on this particular theory of alternative liability. Therefore, they urge that their cases be tested on a market share theory which greatly expands the alternative liability theory.

■ Market share liability is a remedy of last resort which was developed to provide a remedy to injured parties who could not identify the manufacturer of the product which caused them harm. *Conley, supra,* 570 So.2d at 285. A prerequisite to applying the theory has been the inability to trace to any specific producer or supplier the hazardous product. *Sindell,* 163 Cal.Rptr. at 144, 607 P.2d at 936. Mere difficulty in identifying the source of the product is insufficient; plaintiff must make a genuine attempt to identify the party responsible for the harm. *Conley,* 570 So.2d at 286. It does not appear from the record in this case that the suppliers of the gasoline could not be identified or that there was an extensive effort to ascertain their identities. On the contrary, the record shows that some suppliers to the District could be identified, although at periods not relevant to the Bly and Seals claims. In the consolidated actions, appellants apparently were able to identify suppliers. Even appellants state that they identified some evidence of the suppliers, although it was not significant. The Amoco, *et al.* appellees point out, somewhat persuasively, that appellants took only limited discovery in the Bly and Seals cases, even though their exposure period differed from the time period for the consolidated cases, opting instead to rely on the discovery in the Bradley–Carter–Taylor cases in support of their claims.

8. Although this court, where appropriate, may affirm a trial court's decision on a ground different from that relied upon by the trial court, *see Liberty Mut. Ins. v. District of Columbia,* 316 A.2d 871, 875 (D.C.1974), given the nature of the proceedings before the trial court, the disposition reached, and our disposition upholding the trial court's ruling, we do not do so in this case.

In DES cases, where a market share approach has been applied most often, it has been stressed "that the DES situation is a singular case, with manufacturers acting in a parallel manner to produce an identical, generically marketed product, which causes injury many years later...." *Hymowitz, supra,* 541 N.Y.S.2d at 947, 539 N.E.2d at 1075. In *Sindell,* the court found particularly significant in approving a substantial market share approach that "all defendants produced the drug from an identical formula and the manufacturer of the DES which caused plaintiff's injuries cannot be identified through no fault of [her own]...." *Sindell,* 163 Cal. Rptr. at 144, 607 P.2d at 936. Appellants have not shown that we have such extraordinary circumstances present here. Unlike DES cases, appellants allege that they were exposed to gasoline containing a harmful benzene product which was not manufactured by producers all using the same formula. Moreover, the record reveals that the formula can vary for the numerous sources of gasoline products.[9] Appellants have not established a record to show otherwise. Additionally, in DES cases, the product was consumed during the plaintiffs' mother's pregnancy. Thus, the time period for which the market must be determined is of short duration and therefore the market at that time is more readily ascertainable. In contrast, appellants contend that their exposure occurred over a 20 to 30 year period; therefore, the identification and share of those in the market may have fluctuated greatly over time. The task of identifying the market and apportioning damages among manufacturers would present a substantial burden. Under such circumstances, an approximation of liability according to market share, which is employed to ameliorate the injustice of burden shifting and requiring defendants to exonerate themselves, could not be achieved. *See Brown, supra,* 245 Cal.Rptr. at 427, 751 P.2d at 486; *see also Case v. Fibreboard Corp.,* 743 P.2d 1062, 1066–67 (Okla.1987) (market share liability rejected where exposure does not occur within a specific time period which would allow the market to be defined). Nor have appellants claimed that exposure to benzene is the only cause of the illnesses that the decedents suffered. Leukemia, which the decedents contracted, has not been shown by appellants to be a so-called signature illness which results from only benzene. Therefore, we conclude that appellants have not presented a record which would support the conclusion that exposure to gasoline presents the type of extraordinary circumstances which have resulted in the application of the market share theory of liability in DES cases.

Other considerations cause us to reject appellants' position that these cases provide a record basis for adoption of a market share theory of liability. Appellants have not shown that they have joined a substantial share of the market as required by the *Sindell* approach. *See Sindell, supra,* 163 Cal. Rptr. at 144–45, 607 P.2d at 936–37; *see also Brown, supra,* 245 Cal.Rptr. at 425, 751 P.2d at 484 (relevant market is a national market). Although some jurisdictions have allowed a plaintiff to proceed against only one defendant, appellants have not shown that practical considerations favor allowing them to proceed in that way. The courts which have allowed a plaintiff to pursue a claim by identifying a single defendant have held generally that defendants could relieve themselves of liability by proving that they did not produce or market the particular type of drug or distribute in the area at the time that the drug was ingested. *See, e.g., Collins, supra,* 342 N.W.2d at 50. These courts also allow generally an apportionment of damages according to market share. *See Hymowitz, supra,* 541 N.Y.S.2d at 950, 539 N.E.2d at 1078. Here, appellants have not shown that decedents' exposure to benzene was sufficiently confined in time that it would be fairer to place upon appellees the burden of identifying the relevant market for purposes of exculpating themselves or restricting their liability to approximate the market. Thus, even assuming that the theory of liability which appellant advances were a viable one

**9.** According to the answers to interrogatories in the consolidated actions which form a part of the record in this case, the benzene content varied between 0 to 5% by volume, at least from 1984 to the time the response was filed.

in this jurisdiction, the record does not support its applicability to the facts of this case.

For all of these reasons, we conclude that the trial court did not err in finding that the record did not afford an appropriate basis for a radical departure from traditional tort law principles and the adoption of a market share theory of liability.[10] Accordingly, we affirm the decision of the trial court.

---

10. In light of the disposition, we need not address the remaining arguments.